*677 OPINION OF THE COURT
Levine, J.
On this appeal we hold that, under the Establishment Clause of the United States Constitution’s First Amendment, an atheist or agnostic inmate may not be deprived of eligibility for expanded family visitation privileges for refusing to participate in the sole alcohol and drug addiction program at his State correctional facility when the program necessarily entails mandatory attendance at and participation in a curriculum which adopts in major part the religious-oriented practices and precepts of Alcoholics Anonymous (hereinafter A. A.). Thus, we reverse the order of the Appellate Division and grant judgment in favor of petitioner prohibiting respondents from conditioning petitioner’s participation in the Family Reunion Program on attendance in the subject Alcohol and Substance Abuse Treatment Program (hereinafter ASAT Program) as presently constituted.
In so holding, we in no way denigrate the proven effectiveness of the A.A. approach to alcoholism or drug addiction rehabilitation, nor do we imply that State correctional authorities must discontinue the present ASAT Program if it were conducted on a voluntary basis, or that they could not include a noncoercive use of A.A.’s 12-step regimen as part of an alternative prisoner drug and alcohol abuse treatment effort. Likewise, we have no doubt that the Department of Correctional Services could validly construct a rehabilitation model containing incentives and penalties, as in the ASAT Program, providing it offered a secular alternative to the A.A. component. In that way, the State could maintain the neutrality required by the Establishment Clause (see, Walz v Tax Commn., 397 US 664, 673; see also, Bowen v Kendrick, 487 US 589, 606-608).
Facts
Petitioner, an inmate serving a sentence of imprisonment in the State correctional system, was transferred to the Shawangunk Correctional Facility, Ulster County, in May 1991. In his petition in this CPLR article 78 proceeding, he alleged that, prior to this transfer, he had been approved for participation in the Family Reunion Program. Upon arrival at the Shawangunk Facility, he was told that because his criminal history revealed his use of heroin between 1955 and 1968, his continued eligibility for the Family Reunion Program would be contingent on his participation in the ASAT Program at the facility.
*678 After attendance at the ASAT Program for several months, petitioner submitted a grievance requesting that he be excused from further involvement in ASAT without forfeiting his right to participate in the Family Reunion Program. Petitioner had a long-time documented history of having declared himself an atheist or agnostic to correctional authorities. He complained that the ASAT Program he had been attending was based upon religious principles embodied in the "Twelve Steps”[1] and "Twelve Traditions” credos of Alcoholics Anonymous, thereby violating "the portion of the First Amendment of the U.S. Constitution that requires a separation between Church and State.” He attached both manifestos to his grievance.
A member of the facility’s grievance committee initially responded to petitioner’s grievance that "[a]t this time the facility does not offer a substance abuse program (therapeutic) without a religious background.” He later averred that, at that time, he was unfamiliar with the actual workings of the ASAT Program and based his conclusion that it was religion-oriented solely upon his reading the Twelve Steps and Twelve Traditions submitted with petitioner’s grievance.
Petitioner’s grievance was denied. After exhausting all administrative opportunities for relief, he brought this CPLR *679 article 78 proceeding seeking a judgment annulling the determination and requiring respondents to discontinue the requirement of petitioner’s attendance in the "religious” program in order to remain eligible for participation in the Family Reunion Program. Petitioner also alleged that, at a hearing with Shawangunk Facility authorities, both staff and inmate representatives acknowledged that the ASAT Program at the facility was a religious program.
Respondents’ answering papers conceded that a major emphasis of the ASAT Program was the inmate’s participation in self-help groups conducted by A.A. or Narcotics Anonymous (N.A.)[2] volunteers pursuant to A.A.’s Twelve Steps and fully employing the A.A. meeting methodology. Respondents averred that the A.A. practices and precepts have proven to be the most effective method for preventing relapse of the recovering alcoholic or chemical substance abuser. The answering papers characterized the utilization of A.A. and N.A. group practices as a "state of the art” major component of any addiction program. Pointing to A.A. literature,[3] respondents averred that the references to God actually mean some "higher power as the individual may understand such higher power,” not as the concept would be known by "organized religions.” Thus, respondents claimed that the A.A. component of the ASAT Program "does not make specific references to God as an institutional religion would wherein the individual is required to worship, praise, give thanks or petition to a Creator” (Affidavit of Lorraine Cohen, Senior Correctional Counselor for ASAT, NY St Dept of Correctional Servs).
Supreme Court dismissed the petition without affording petitioner a hearing to develop a record of the facts underlying his complaint. The Appellate Division affirmed (211 AD2d 187). As previously noted, the Appellate Division relied upon the A.A. Big Book and the A.A. Twelve Steps/Twelve Traditions *680 texts to find, that, despite the repeated references to "God” in the Twelve Steps and Twelve Traditions, A.A. does not " ’demand’ ” adherence to any particular faith but to " ’spirituality’ ” and " 'open mindedness’ ” (id., at 190 [quoting the A.A. Big Book and A.A. Twelve Steps/Twelve Traditions]). The Court also found quite significant that A.A. allows participants to select their own conception of God, as shown by the reference in Step 3 to "God as we understood Him”
On the foregoing basis, the Appellate Division concluded that petitioner’s documentary evidence did not establish that the A.A. component of the ASAT Program was a religious exercise violating the Establishment Clause. Absent proof of a more sectarian actual practice at the A.A. meetings petitioner was required to attend, the Court held that his petition was properly dismissed. We granted petitioner leave to appeal the Appellate Division’s ruling and now reverse.
Analysis
In our view, the Appellate Division erred in rejecting the petition in this case by applying too narrow a concept of religion or religious activity for. Establishment Clause analysis and disregarding the compulsion used to induce petitioner to attend and participate in A.A. meetings heavily laced with at least general religious content. Moreover, even if we were to agree with the Appellate Division’s holding that the governing principles and practices of A.A., as incorporated in the ASAT Program, do not necessarily require an atheist participant to accept the existence of God in the religious sense, or to engage in religious activity, we would, nonetheless, find that the mandatory and exclusive incorporation of A.A. doctrine and practices in the ASAT program violates Establishment Clause principles requiring governmental neutrality with respect to religion (see, Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US 687, 696-697; Abington School Dist. v Schempp, 374 US 203, 222), and prohibiting governmental endorsement of religion (Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, supra; Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 592-593; Lemon v Kurtzman, 403 US 602, 612).
I
A reading of the ASAT Program Operations Manual reveals — and respondents do not dispute — that essential major *681 components, indeed, the heart of the program, are the A.A. Twelve Step manifesto itself and inmate participation in the group sessions conducted by A.A. and N.A. volunteers utilizing the A.A. modus operandi. Thus, the ASAT Program Manual lists in its "Mission Statement” its purpose to prepare addicted inmates to return to the community and to reduce recidivism "by providing education and counseling on continued abstinence * * * and participation in self-help groups based on the '12-step’ approach.” The Manual designates as the first element of the "philosophy” of the ASAT Program the "12-step approach,” i.e., "a set of principles which teach an individual how to build a life based on sobriety.” Adopting the basic A.A. methodology, the ASAT Program’s "Philosophy” declares the effectiveness of "working the 12 suggested steps [which] * * * act as a guide * * * to build a new way of life without the use of alcohol and/or drugs, one day at a time” (emphasis supplied). The Manual describes the ASAT Program content as including education and counseling with a curriculum based upon the " '12-step’ approach to recovery.”
Concededly, there are passages in A.A. literature, relied upon heavily by respondents, the Appellate Division and the dissent here, which, in stressing the openness and inclusiveness of the A.A. movement, eschew any intent to impose a particular sectarian set of beliefs or a particular concept of God upon participants. However, a fair reading of the fundamental A.A. doctrinal writings discloses that their dominant theme is unequivocally religious, certainly in the broad definitional sense as "manifesting faithful devotion to an acknowledged ultimate reality or deity” (Webster’s 9th New Collegiate Dictionary 995 [9th ed 1990]). Indeed, the A.A. basic literature most reasonably would be characterized as reflecting the traditional elements common to most theistic religions. Thus, God is named or referred to in five of the 12 steps. "Working” the 12 steps includes confessing to God the "nature of our wrongs” (Step 5), appealing to God "to remove our shortcomings” (Step 7) and seeking "through prayer and meditation” to make "contact” with God and achieve "knowledge of His Will” (Step 11 [emphasis supplied]). The 12 Traditions include a profession of belief that "there is one ultimate authority — a loving God as He may express Himself in our group conscience.”
While A.A. literature declares an openness and tolerance for each participant’s personal vision of God ("os we understood Him” [Steps 3 and 11] [emphasis in the original]), the writings demonstrably express an aspiration that each member of the *682 movement will ultimately commit to a belief in the existence of a Supreme Being of independent higher reality than humankind. Thus, in the A.A. Big Book — the basic text of A.A. — chapter 1, "Bill’s Story,” describes the spiritual transformation of one of the cofounders of A.A., in which he finally achieved salvation from his alcoholism: by "entering] upon a new relationship with my Creator * * * [i]t meant destruction of self-centeredness. I must turn in all things to the Father of Light who presides over us all” (A.A. Big Book, at 13-14). In chapter 4, entitled "We Agnostics” the theme is unambiguously proselytizing:
"As soon as we admitted the possible existence of a Creative Intelligence, a Spirit of the Universe underlying the totality of things, we began to be possessed of a new sense of power and direction, provided we took other simple steps. We found that God does not make too hard terms with those who seek Him” (id., at 46).
"Instead of regarding ourselves as intelligent agents, spearheads of God’s ever advancing Creation, we agnostics and atheists chose to believe that our human intelligence was the last word, the alpha and the omega, the beginning and end of all. Rather vain of us, wasn’t it?
"We, who have traveled this dubious path, beg you to lay aside prejudice, even against organized religion. We have learned that whatever the human frailties of various faiths may be, those faiths have given purpose and direction to millions. People of faith have a logical idea of what life is all about” (id., at 49).
A.A.’s Twelve Steps/Twelve Traditions volume, describing the spiritual evolution of atheists and agnostics through working the 12 steps, states:
"Consequently, in Step Three, we turned our will and our lives over to the care of God as we understood Him. For the time being, we who were atheist or agnostic discovered that our own group, or A.A. as a whole, would suffice as a higher power. Beginning with Step Four, we commenced to search out the things in ourselves which had brought us to physical, moral, and spiritual bankruptcy” (A.A. Twelve Steps/Twelve Traditions, at 107).
*683 "So, practicing these Steps, we had a spiritual awakening about which finally there was no question. Looking at those who were only beginning and still doubted themselves, the rest of us were able to see the change setting in. From great numbers of such experiences, we could predict that the doubter who still claimed that he hadn’t got the 'spiritual angle, ’ and who still considered his well-loved A.A. group the higher power, would presently love God and call Him by name” (id., at 109 [emphasis supplied]).
The foregoing demonstrates beyond peradventure that doctrinally and as actually practiced in the 12-step methodology, adherence to the A.A. fellowship entails engagement in religious activity and religious proselytization. Followers are urged to accept the existence of God as a Supreme Being, Creator, Father of Light and Spirit of the Universe. In "working” the 12 steps, participants become actively involved in seeking such a God through prayer, confessing wrongs and asking for removal of shortcomings. These expressions and practices constitute, as a matter of law, religious exercise for Establishment Clause purposes, no less than the nondenominational prayer in Engel v Vitale (370 US 421), that is, "a solemn avowal of divine faith and supplication for the blessings of the Almighty. The nature of such a prayer has always been religious” (id., at 424-425 [emphasis supplied]; see also, Lee v Weisman, 505 US 577, 603-604 [Blackmun, J., concurring]).
The ASAT Manual not only fails to disclaim and disassociate the prison system’s drug and alcohol addiction treatment program from A.A.’s religious approach to combatting these afflictions, but actually embraces and reinforces worship in the A. A. mold. Thus, the ASAT Manual includes as part of its curriculum, group discussions of "[w]hat it means to work the 12 steps;” exploration of "issues of higher power,” with use of a suggested audio entitled "The Will of God;” and prayer and meditation in conjunction with a suggested video entitled "Our Father.”
The dissent does not dispute the accuracy of our documentation of the content of A.A. doctrinal texts. Instead, the dissent disavows the significance of the repeated "deistic symbols and allusions” (dissenting opn, at 697) in fundamental A.A. doctrine, that is, to God as a Supreme Being with whom contact through prayer is exhorted, and the like, although, undeniably, the words used "ha[vej always been religious” (Engel v Vitale, *684 supra, at 424-425). We have purposely quoted at length from the A.A. doctrinal texts to eliminate any doubt but that the references to God and prayer in the Twelve Steps were intended in their "conventional sense” (Welsh v United States, 398 US 333, 352 [Harlan, J., concurring]). That is, the A.A. basic doctrinal writings clearly express a preference for and a conviction favoring a concept of God and prayer which is not merely " 'a conscientious social belief, or a sincere devotion to a high moralistic philosophy [but] one based upon an individual’s belief in his responsibility to an authority higher and beyond any worldly one’ ” (id., at 348).[4]
In an effort to downplay the religiosity of the foregoing A.A. tenets, the dissent suggests, without verification from actual source materials, that the unequivocally proselytizing themes of early A.A. texts have implicitly been superseded by later more secular A.A. writings into which A.A. doctrine has evolved, which will become apparent if one would only examine all of the A.A. doctrinal materials in their historical contexts (see, dissenting opn, at 699-700). In this fashion, the dissent discounts entirely, the A.A. Big Book, first written in 1939, instead relying exclusively (id., at 701, 702) on the Twelve Traditions portion of the A.A. Twelve Steps/Twelve Traditions volume published in 1952, particularly because it declares "against sectarian preference” (id., at 701), as though the Establishment Clause only bars State preferences for a particular sect or sects.
The dissent’s thesis that there was an historical evolution of A.A. doctrine and therapeutic/rehabilitative methodology from the initial, more religious A.A. Big Book to the later, essentially secular, Twelve Traditions (see, dissenting opn, at 699-700, 702-703), is refuted by the writings themselves. Thus, the 1952 A.A. Twelve Steps/Twelve Traditions volume itself states unequivocally in its Foreword that "[t]he book 'Alcoholics Anonymous’ [the 1939 A.A. Big Book] became the basic text of the Fellowship, and it still is” (A.A. Twelve Steps/Twelve Traditions, at 17 [emphasis supplied]). The Foreword to the *685 1952 volume also explains the differing roles of the Twelve Steps and the Twelve Traditions. "A.A.’s Twelve Steps are a group of principles, spiritual in nature, which, if practiced as a way of life, can expel the obsession to drink and enable the sufferer to become happily and usefully whole” (A.A. Twelve Steps/Twelve Traditions, at 15 [emphasis supplied]). "[T]he spiritual ideas of the Society were codified for the first time in the Twelve Steps” (id., at 17 [emphasis supplied]).
The Foreword to the A.A. Twelve Steps/Twelve Traditions also articulates the function and origin of the Twelve Traditions, that "[tjhey outline the means by which A.A. maintains its unity and relates itself to the world about it” (id., at 15 [emphasis supplied]). The Twelve Traditions were developed as the A.A. movement began to achieve widespread acceptance, in response to "threatening questions of membership, money, personal relations, public relations, management of groups, clubs, and scores of other perplexities” (id., at 18).
Thus, the 1952 volume, a portion of which the dissent relies upon as demonstrating a basic A.A. doctrinal shift to the secular, itself explains the dichotomy of roles between the A.A. Big Book and Twelve Steps on the one hand, and the Twelve Traditions on the other. The former writings contain A.A.’s spiritual doctrines and therapeutic, rehabilitative modalities, to be "practiced as a way of life” (id., at 15). As we have demonstrated, these texts are unequivocally religious in theme and proselytizing in content.
Conversely, the Twelve Traditions essentially deal with the nondoctrinal, secular problems which can be expected to arise and challenge any popular movement — organizational structure, finances, membership eligibility, management authority and the like. It should come as no surprise, therefore, that the content of the Twelve Traditions is more secular and less religious in tone than its Twelve Steps companion piece in the same volume. That is because it was designed not to supersede the reverent doctrines and practices of the A.A. literature which we have already quoted, but to address the essentially secular issues the A.A. movement confronted as it achieved public acceptance. Even then, the Twelve Traditions portion of A.A. Twelve Steps/Twelve Traditions reaffirms the essential religious convictions of the A.A. society. In the "long form” Twelve Traditions, Tradition Three contains a parable concerning an atheist, "Ed”, who, after joining A.A. protested all of the "God stuff” of practicing the Twelve Steps. Then, as expected, Ed lapsed from sobriety, until, alone and "holed up *686 in a cheap hotel * * * [a]s he tossed in bed, his hand brushed the bureau near by, touching a book. Opening the book, he read. It was a Gideon Bible. * * * It was the year 1938. He hasn’t had a drink since” (A.A. Twelve Steps/Twelve Traditions, at 143-145). Thus, while it is of course true that the primary objective of A.A. is to enable its adherents to achieve sobriety, its doctrine unmistakably urges that the path to staying sober and to becoming "happily and usefully whole,” is by wholeheartedly embracing traditional theistic belief.
Even if the dissent’s disavowal of A.A.’s religiosity is found not compelling, the dissenters suggest that the A.A. component - of the ASAT Program (1) is essentially insignificant or "attenuated” (see, dissenting opn, at 699), albeit requiring at least weekly attendance at A.A. operated group meetings for 26 weeks and constant working of the Twelve Steps in all other parts of the ASAT curriculum; and (2) is readily severable from the predominantly secular ASAT Program (dissenting opn, at 709), although the ASAT Program Manual itself states that participation in the A.A. group meetings is "essential to the fulfillment of program goals” (emphasis supplied). These alternative arguments are therefore also unpersuasive.
II
Once, thus, it has been demonstrated that A.A. tenets and practices necessarily entail religious exercise, the conclusion appears unavoidable that its use by the State correctional system as an essential component of an exclusive, compulsory attendance ASAT Program violates the Establishment Clause. Here, the State, through its correctional authorities at the Shawangunk Facility, has exercised coercive power to advance religion by denying benefits of eligibility for the Family Reunion Program to atheist and agnostic inmates who object and refuse to participate in religious activity which is an inextricable part of the ASAT Program. No secular drug and alcohol addiction treatment program devoid of A.A.’s practices and doctrines, which would qualify an inmate for eligibility to participate in the Family Reunion Program, is offered as a substitute.
A.
There is no firmer or more settled principle of Establishment Clause jurisprudence than that prohibiting the use of the State’s power to force one to profess a religious belief or participate in a religious activity. As Justice Black explained in the *687 first case applying the Establishment Clause to the States, "[t]he 'establishment of religion’ clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. * * * Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs” (Everson v Board of Educ., 330 US 1, 15-16 [emphasis supplied]).
The Court in Torcaso v Watkins (367 US 488) struck a provision of a State Constitution conditioning the right to hold public office on a declaration of belief in God, holding: "[w]e repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person (to profess a belief or disbelief in any religion.’ Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs” (id., at 495 [emphasis supplied]).[5]
Indeed, in Lee v Weisman (505 US 577, supra), although the Supreme Court split on whether a junior high school’s inclusion of a nondenominational prayer at its graduation exercises was coercive, the Court was unanimous in condemning State compulsion to attend or participate in a religious practice. Justice Kennedy, writing for the majority, stated (505 US, at 596): "[i]t is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice.” Concurring in Lee v Weisman, Justice Blackmun opined that coerced attendance at a religious exercise is invariably sufficient to establish an Establishment Clause violation (505 US, at 604, supra): "[although our precedents make clear that proof of government coercion is not necessary to prove an Establishment Clause violation, it is sufficient. Government pressure to participate in a religious activity is an obvious indication that the government is endorsing or *688 promoting religion” (emphasis supplied). And Justice Scalia for the four dissenting Justices agreed that the Establishment Clause bars coercion by "/orce of law and threat of penalty” (emphasis in the original) to engage in a religious activity, such as requiring a person to "attend church and observe the Sabbath” (505 US, at 640, 641, supra).[6]
Thus, it follows that the Shawangunk Correctional Facility may not constitutionally require petitioner "to forfeit his * * * benefits [eligibility for the Family Reunion Program] as the price of resisting conformance to state-sponsored religious practice” (Lee v Weisman, supra, 505 US, at 596). The enforced attendance at A.A. meetings as part of the ASAT Program violates the Establishment Clause in that "on audience gathered by state power is lent * * * to a religious cause” (Tribe, American Constitutional Law, at 1170 [2d ed] [emphasis supplied]). In that way the Shawangunk Facility has "apparently employed the machinery of the state to gather an [involuntary] audience for religion” (id., at 1173).
B.
Despite the overwhelmingly religious tone of the A.A. basic texts as quoted above, literally urging performance of quite traditional religious devotional exercises in working the 12 steps, and the pressure put on petitioner to attend A.A. sessions at pain of losing family contacts, the Appellate Division apparently accepted respondents’ position that the Establishment Clause was not violated because other A.A. writings suggest a toleration of belief in a "God” as merely some "Higher Power” without any religious content (see, 211 AD2d, at 189-190). Therefore, the Appellate Division concluded, the petition fails even at the pleading stage, in the absence of some extrinsic evidence of religious coercive techniques used in actual practice at A.A. meetings in the Shawangunk Facility *689 (211 AD2d, at 194). Aside from the obvious difficulty in conceptualizing how one could perform a confessional of "wrongs” (Step 5) or seek, through "prayer,” "contact” (Step 11) with a God devoid of religious content, the Appellate Division’s rationale for upholding the A.A. component of the ASAT Program is erroneous in two respects. First, even if respondents are correct that A.A. permits a secular interpretation of its doctrines and practices, undeniably its paramount theme, as we have demonstrated, favors a religious interpretation. Therefore, respondents’ defense fails under the "wholesome ’neutrality’ ” requirement of the Establishment Clause (see, Abington School Dist. v Schempp, 374 US 203, 222, supra [emphasis supplied]).
The A.A. volunteers who are invited to conduct the prison self-help group meetings of inmates in the ASAT Program, where the 12 steps are worked, can reasonably be expected to be wholeheartedly imbued with and committed to the religious precepts predominating in the A.A. basic texts. It, therefore, is highly unlikely that the religious indoctrination of A. A. volunteer leaders would not affect the tone and content of A.A. sessions for inmates. Exactly that result was proved at trial before the United States District Court in Warner v Orange County Dept. of Probation (870 F Supp 69 [SD NY]). There, the plaintiff was required to participate in A.A. meetings as a condition of probation upon his State conviction for drunken driving. The United States District Court found that "[g]roup prayer was common at the A.A. meetings plaintiff attended. Many of the meetings began with a non-denominational 'Serenity Prayer’ * * * and all of the meetings ended with the Lord’s Prayer, which is a specifically Christian prayer. In addition, those attending the meetings were strongly encouraged to pray” (id., at 71). In O’Connor v State of California (855 F Supp 303, 306 [D Cal]), virtually identical findings were made on the religiously oriented conduct of A.A. meetings, attendance at which had been imposed as an alternate condition of probation.
Infringement of the neutrality principle underlying the Establishment Clause is readily apparent here. The State, through its ASAT Program, delegates to A.A. volunteers a crucial part of the State’s discretionary authority to conduct mandatory treatment programs for alcohol and drug addicted inmates in the State’s prison system. Inmates are pressured to participate in the program by the State’s conditioning eligibility for the Family Reunion Program on attendance. Yet correctional authorities have not incorporated into the ASAT *690 Program any effective means to insure that A.A. meetings for inmates are free of religious content and that rehabilitation and treatment are performed by purely secular means, rather than the unequivocally proselytizing messages of the A.A. Big Book and A.A. Twelve Steps /Twelve Traditions we have previously quoted.
In the foregoing respects, the State-adopted exclusive but mandatory ASAT Program fails to pass Establishment Clause muster for the same reason that the Supreme Court affirmed this Court’s invalidation of the New York statute creating a special school district in Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet (512 US 687, supra). Here, as in Kiryas Joel, the State "departs from [the constitutional command of neutrality] by delegating the State’s discretionary authority over [a required rehabilitation program for prison inmate addicts] to a group defined” by its literature and governing precepts as committed to encouraging acceptance of religious doctrine; yet the State "gives no assurance that [such] governmental power has been or will be exercised neutrally” (id., 512 US, at 696).
C.
In apparently concluding that no Establishment Clause violation occurred here because A.A. does not require a participant to adhere to a sectarian belief in God, but permits one to entertain a secular concept of a Higher Power devoid of religious content, the Appellate Division committed a second error by disregarding application of the second prong of the three-part test (the purpose-effect-entanglement test) for primary Establishment Clause analysis articulated in Lemon v Kurtzman (403 US 602, supra). Contrary to the implicit rationale of the Appellate Division, State-coerced adherence to a religious sect is not necessary to prove an Establishment Clause violation under any portion of the Lemon test (id.; see also, Lee v Weisman, supra, 505 US, at 603-604 [Blackmun, J., concurring]). Specifically, under the second prong of the Lemon test, State action is invalid if its "primary effect” is to advance or promote religion (Lemon v Kurtzman, 403 US, at 612, supra).
Since its articulation as the second prong of the Lemon test in Establishment Clause jurisprudence, there have been several important refinements to the "primary effect” test. First, a "primary” effect of advancing religion does not connote that the religious consequences of the State action must predominate over any secular objective or consequence. No measure *691 ment or weighing of the respective secular and religious effects is required. "We do not think that such metaphysical judgments are either possible or necessary. Our cases simply do not support the notion that a law found to have a 'primary* effect to promote some legitimate end under the State’s police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion” (Committee for Pub. Educ. v Nyquist, 413 US 756, 783-784, n 39 [emphasis supplied]). A violation also is established if the State action’s "inevitable effect [is] to aid and advance” religion (id., at 793 [emphasis supplied]).
In addition, later decisions construing the second prong of Lemon "have refined the definition of governmental action that unconstitutionally advances religion * * * [by] pay[ing] particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing’ religion” (Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 592, supra). That concept " 'preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred”’ (id., at 593 [quoting Wallace v Jaffree, 472 US 38, 70 (O’Connor, J., concurring)]). The prohibition against governmental endorsement of religion means "at the very least, [that government is barred] from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person’s standing in the political community’ ” (Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US, at 594, supra [quoting Lynch v Donnelly, 465 US 668, 687 (O’Connor, J., concurring)]). An endorsement violating the Establishment Clause can be determined by examining whether the message that the government’s practice communicates may be fairly understood as favoring or promoting religion (id., at 595). That is, it must be ascertained whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices” (Grand Rapids School Dist. v Ball, 473 US 373, 390).
Applying the foregoing criteria we conclude that the inclusion of the A. A. 12 steps and other doctrines and meeting practices in a mandated, exclusive drug addiction and alcoholism rehabilitation program at the Shawangunk Correctional Facility constitutes the prohibited endorsement of religion violating the Establishment Clause. It is simply unimaginable that *692 inmates in the inherently authoritarian atmosphere of a prison would not perceive that such a mandatory, exclusive program, facially containing expressions and practices that "ha[ye] always been religious” (Engel v Vitale, 370 US, at 424-425, supra), favors inmates who adhere to those beliefs, and symbolically condones the religious proselytizing those expressions literally reflect (Grand Rapids School Dist. v Ball, 473 US, at 390-391, supra). Indeed, this very perception of the A.A. component of the ASAT Program was what prompted the initial written response of a facility official to petitioner’s grievance, stating upon reading the Twelve Steps and Twelve Traditions, that the facility did not offer a "program (therapeutic) without a religious background.”
For all the foregoing reasons, a mandatory, exclusive ASAT addiction treatment program at the Shawangunk Correctional Facility incorporating the A.A. Twelve Steps methodology, credo and meeting practices, violates the Establishment Clause.
Ill
Before concluding this opinion, we find it necessary to respond to some of the dissent’s criticisms of our holding. First, the dissent misreads our decision in persistently characterizing it (a) as hostilely "root[ed] in a proposition” that A.A. itself and its religious practices and precepts are constitutionally "objectionable” (dissenting opn, at 699; see also, id., at 700-701, 705-706, 706); and (b) as implicitly holding that the Establishment Clause was violated merely by the "importation” (dissenting opn, at 705), "permeation” (id., at 706), "religious alchemy” and "profound absorption” (id., at 714) of the incorporation of A.A. materials into the ASAT curriculum. The latter interpretation of our holding appears to underlie the dissent’s criticism that we have found the ASAT curriculum to be "a dominating form of religious coercion” (dissenting opn, at 708), and the dissent’s suggestion that we have empowered petitioner to dictate the content of the ASAT curriculum " 'to [his] individual preferences’ ” (id., at 706). This also appears to account for the dissenters’ "puzzle[ment]” (id., at 704) respecting our position that incorporation of A.A. components into a truly voluntary inmate drug rehabilitation program could validly be accomplished.
Neither of these two characterizations of our holding finds even inferential support, let alone express substantiation in the majority writing. To the contrary, we have repeatedly indicated throughout the decision that the decisive factor in our analysis was not the incorporation of A.A. doctrine and *693 practices into the ASAT Program, but the facility’s application of coercive pressure to participate in an exclusive inmate drug and alcohol treatment program having that component (see, supra, at 686-688, 689-690, 691, 695-696). Rather than condemning A.A. and its practices we specifically acknowledged A.A.’s "proven effectiveness” (supra, at 677). Our decree specifically prohibits only the coercive aspects of conditioning petitioner’s eligibility for the Family Reunion Program on attendance in the ASAT Program as presently constituted.
Second, pointing to the commendable secular purposes and effects of both the ASAT Program and A.A. in the battle against alcohol and drug addiction, the dissent appears to conclude that any religious aspects of the incorporation of mandated A.A. devotional materials and practices are outweighed by the secular purposes and effects of ASAT and A.A. Thus, the dissenters list as "key” to their vote to affirm their evaluation that the ASAT Program and A.A. remain "overwhelmingly secular” (dissenting opn, at 698 [emphasis supplied]); and repeatedly stress the "predominantly secular” "goal[s]”, "aim[s]” and "purpose[s]” of ASAT and A.A. (see, id., at 697, 701, 706, 708-709, 709). The teaching of the Supreme Court decisions, as we have already noted, rejects subjective assessments purporting to quantify the respective religious and secular purposes and effects of governmental action (see, Committee for Pub. Educ. v Nyquist, 413 US 756, 783-784, n 39, supra ["Our cases simply do not support the notion that a law found to have a 'primary’ effect to promote some legitimate end under the State’s police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion”]).
Alternatively, the dissent argues that we have too rigorously applied the reach of the Establishment Clause (dissenting opn, at 700-701) and, relying upon Justice Brennan’s concurring opinion in McDaniel v Paty (435 US 618, 638-639, 641) (dissenting opn, at 705) attempts to bring this case within the rubric of precedents more loosely applying the Establishment Clause when strict enforcement would conflict with the values reflected in the Free Exercise Clause or the Free Speech Clause of the First Amendment.[7] Thus, the dissent gives special emphasis to the portion of Justice Brennan’s McDaniel opinion *694 stating that the Establishment Clause may not be used " 'as a sword to justify repression of religion or its adherents from any aspect of public life’ ” (435 US, at 641, supra) (dissenting opn, at 705). These precedents are entirely inapposite to the instant case, or to our ruling in it. Our holding does not interfere with any inmate’s free choice to avail him or herself of A.A. religious practices in a prison setting to combat alcohol or drug addiction, or freely to enter into the present ASAT Program. Rather, our ruling identifies as the critically objectionable aspect of respondent’s correctional policy here, the application of coercive pressure upon petitioner to attend and participate in a religious exercise at penalty of losing any possibility for cherished, expanded family contacts. Thus, we think more fitting to the issues here are the following excerpts from Justice Brennan’s concurrence in McDaniel v Paty:
"Beyond these limited situations in which government may take cognizance of religion for purposes of accommodating our traditions of religious liberty, government may not use religion as a basis of classification for the imposition of duties, penalties, privileges or benefits. * * *
"Fundamental to the conception of religious liberty protected by the Religion Clauses is the idea that religious beliefs are a matter of voluntary choice by individuals and their associations” (McDaniel v Paty, 435 US, at 639-640, supra [Brennan, J., concurring] [emphasis supplied]).
Indeed, where we particularly part company with the dissent is in the respective responses to the coercive aspect of correction facility policy regarding the ASAT Program and inmate/family visitation. As we have already quoted, the core principle of the Establishment Clause is that religious observance must be "a matter of voluntary choice” (id., at 640), and that the State may not "force nor influence a person to go to * * * church against his will or force him to profess a belief’ (Everson v Board of Educ., supra, 330 US, at 15-16).
*695 Even those scholars who urge a shift to a more flexible, accommodating approach to Establishment Clause jurisprudence than the present Supreme Court decisions would dictate, recognize the need for retaining the vitality of that principle. Thus, Professor Witte, in the same article relied upon by the dissent (see, dissenting opn, at 705), would continue to condemn accommodations of religion which "effectively coerce public participation in religious exercises such as prayer” (Witte, The Essential Rights and Liberties of Religion in the American Constitutional Experiment, 71 Notre Dame L Rev 371, 428 [emphasis supplied]). Nor would Witte limit the prohibition to school prayer cases, which the dissent suggests are sui generis and totally inapplicable here (dissenting opn, at 713-714). Rather, Witte applies a universal, enduring principle of voluntarism as the central meaning of the Establishment Clause, that to "effectively coerce” a person to attend religious .exercises such as prayer violates the Constitution because "[pjarties will choose to participate in the prayer * * * not out of voluntary conviction, but because of the civil and social advantages attached to [it]” (Witte, op. cit., at 428 [emphasis supplied]; see also, Welsh v United States, 398 US 333, 356-357, supra [Harlan, J., concurring]; Torcaso v Watkins, 367 US 488, 495, supra).
The dissent, however, denies that conditioning eligibility for the Family Reunion Program on full attendance and participation in ASAT, including its A. A. component, was coercive, since petitioner "voluntarily chose the course of action that placed his agnosticism” above his desire to achieve extended family contacts and because the facility retained discretion to exclude him from the Family Reunion Program in any event (dissenting opn, at 711). Such a narrow, grudging application of the anticoercive core of the Establishment Clause is inconsistent with the case law, barring even State "influence” to attend a religious exercise (Everson, supra).
Likewise, in Zorach v Clauson (343 US 306) — a case invoked by the dissent (dissenting opn, at 705, 710, 713) for the proposition that petitioner was not coerced by the threat of lost eligibility for the Family Reunion Program — Justice Douglas, in rejecting the Establishment Clause claim, expressly relied upon the total absence of any influence by school authorities on a student’s election to take religious instruction:
"The present record indeed tells us that the school authorities are neutral in this regard and do no more than release students whose parents so *696 request. If in fact coercion were used, if it were established that any one or more teachers were using their office to persuade or force students to take the religious instruction, a wholly different case would be presented” (id., at 311 [emphasis supplied]).
The dissent’s "voluntary choice” regarding a "discretionary” family visitation program rationalization is identical to the Maryland Court of Appeals’ theory for upholding its State Constitution’s test oath for eligibility for elective or appointive public office in Torcaso v Watkins (supra), that is, that the petitioner was not under " 'compulsion [to believe in God because] * * * he is not compelled to hold [public] office.’ ” (367 US, at 495.) The Supreme Court rejected that rationale, holding that, while a person may neither be compelled to hold nor have an abstract, right to public office, that "cannot possibly be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution” (id., at 495-496).
Nor is the dissent’s position consistent with the constitutional history of the Establishment Clause, which demonstrates an intention to protect religious voluntarism against even subtle governmental pressure. Thus, Justice Brennan in Abington School Dist. (supra), in interpreting the clause as a mandate to leave religious matters completely to the free conscience of the citizen, quoted the following from the congressional debates on the Bill of Rights: " 'the rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand’ ” (374 US, at 231 [quoting Representative Daniel Carroll of Maryland during the debate upon the proposed Bill of Rights in the First Congress, August 15, 1789, I Annals of Cong 730] [emphasis supplied]).
Indubitably, the State through its Shawangunk Correctional Facility officials have applied far more than the "gentlest touch” to make petitioner violate his personal conscience by depriving him of opportunities for increased family visits because he refused to attend and participate in A.A. activities heavily imbued with religious content. Therefore, the State’s requirement that petitioner fully participate in the present ASAT Program in order to qualify for the Family Reunion Program violates the Establishment Clause and cannot be permitted to stand.
Accordingly, the order of the Appellate Division should be reversed, without costs, and judgment granted in favor of *697 petitioner prohibiting respondents from conditioning petitioner’s participation in the Family Reunion Program on attendance in the subject Alcohol and Substance Abuse Treatment Program, as presently constituted.

. The "Twelve Steps” are as follows:
"1. We admitted we were powerless over alcohol — that our lives had become unmanageable.
"2. Came to believe that a Power greater than ourselves could restore us to sanity.
"3. Made a decision to turn our will and our lives over to the care of God as we understood Him.
"4. Made a searching and fearless moral inventory of ourselves.
"5. Admitted to God, to ourselves, and to another human being the exact nature of our wrongs.
"6. Were entirely ready to have God remove all these defects of character.
"7. Humbly asked Him to remove our shortcomings.
"8. Made a list of all persons we had harmed, and became willing to make amends to them all.
"9. Made direct amends to such people wherever possible, except when to do so would injure them or others.
"10. Continued to take personal inventory and when we were wrong promptly admitted it.
"11. Sought through prayer and meditation to improve our conscious contact with God as we understood Him, praying only for knowledge of His will for us and the power to carry that out.
"12. Having had a spiritual awakening as the result of these steps, we tried to carry this message to alcoholics, and to practice these principles in all our affairs” (Alcoholics Anonymous World Services, Inc., Alcoholics Anonymous, at 59-60 [3d ed 1976] [emphasis in original]).

. The parties agree that Narcotics Anonymous has adopted the Twelve Steps of A.A. as its guiding principle and that its beliefs and practices do not vary in any significant way from A.A.

. It is evident that respondents were relying primarily on a book entitled "Alcoholics Anonymous,” subtitled as the "Third Edition of the Big Book, the Basic Text For Alcoholics Anonymous” (Alcoholics Anonymous World Services, Inc. [3d ed 1976]) (hereinafter A.A. Big Book), and a text entitled "Twelve Steps and Twelve Traditions” (Alcoholics Anonymous World Services, Inc. [13th ed 1983]) (hereinafter A.A. Twelve Steps/Twelve Traditions). Although neither of these works was part of the record in the courts below, apparently they were handed up by respondents and they are referred to at length in the Appellate Division’s decision (see, 211 AD2d 187, 189-190).

. The dissent’s criticism of our "inordinate * * * inflation” of A.A. writings because they are "not documented by a customary * * * record basis” (dissenting opn, at 708) is unwarranted. It was respondents, in all courts throughout this proceeding, who have invoked and cited to these A.A. basic doctrinal texts, ostensibly to show that all references to God and prayer in the Twelve Steps were secular. Not even respondents now claim that these writings are not properly before this Court to explain the A.A. 12-steps credo and methodology incorporated in the ASAT Program.

. Both the dissent and the Appellate Division rely heavily on A.A.’s "explicit declaration against sectarian preference” as being dispositive (see, dissenting opn, at 701; 211 AD2d, at 190). Torcaso clearly interdicts governmental pressure favoring religion generally — not merely favoring a particular religious sect or sects. This view of the reach of the Establishment Clause is supported by respected constitutional law scholars (see, 4 Rotunda and Nowak, Constitutional Law — Substance and Procedure § 21.3, at 453 [2d ed]; see also, Abington School Dist. v Schempp, 374 US 203, 216-217, supra).

. The foregoing opinions of all nine of the Justices in Lee v Weisman dealing with anticoercion as a settled precept of the Establishment Clause either independently or as a prohibited governmental endorsement of religion in violation of the second prong of the three-part Establishment Clause test of Lemon v Kurtzman (supra), effectively dispose of the dissent’s criticism that we have wrongfully interjected a "dominant” coercion element (dissenting opn, at 704; see also, id,., at 703), in a "novel” (id., at 703) or "tenuous” manner (id., at 697) unsupported by precedent, to Establishment Clause jurisprudence. See also the views of constitutional scholar Laurence Tribe, quoted infra. Our Court also recognized that anticoercion was an essential precept of the Establishment Clause in New York State School Bds. Assn. v Sobol (79 NY2d 333, 337).

. The dissent also invokes language in O’Lone v Estate of Shabazz (482 US 342, 349) (dissenting opn, at 710), and relies upon it and other prison inmate cases (id., at 712, 714) in which some limitations on free exercise and free speech rights of inmates have been upheld in balancing those interests *694 against legitimate State penological interests. Moreover, the dissent also cites (id., at 706) with approval Boyd v Coughlin (914 F Supp 828) wherein the United States District Court did apply a balancing test to an inmate’s Establishment Clause claim (see, id., at 831-832). Such balancing has never been applied by the Supreme Court in an Establishment Clause case. Adopting a balancing approach here would be unprecedented and raise serious implications beyond the prison context.