**Paul COX, Petitioner,**

v.

**David MILLER, Supt.,
etc., Respondent.**

**No. 01 CIV. 3751(CLB).**

United States District Court,
S.D. New York.

July 30, 2001.

Robert N. Isseks, Alex Smith, Middletown, NY, for Petitioner.

Robin Lamont, Assistant District Attorney, Jeanine Pirro, District Attorney of Westchester County, White Plains, NY, for Respondent.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

By his counseled Petition filed May 3, 2001 in this Court, Paul Cox, a state prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction after a jury trial in the County Court of the State of New York, County of Westchester (Cowhey, J), on December 6, 1994, for two counts of manslaughter in the first degree in violation of New York Penal Law. The conviction was affirmed by the Appellate Division of the New York Supreme Court, Second Judicial Department on September 27, 1999. *People v. Cox*, 264 A.D.2d 854, 696 N.Y.S.2d 177 (2d Dept.1999) and leave to appeal to the New York Court of Appeals was denied on February 7, 2000. He was sentenced on March 14, 1995 to two consecutive terms of 8–1/3 to 25 years, for a total of 16–2/3 to 50 years. The Petition asserts some six separate Points as grounds for relief. We now consider Points 5 and 6.

In Point 5, Petitioner claims that his fingerprints and palm print found at the scene were the fruits of an arrest unsupported by probable cause and that their admission was in violation of the Fourth Amendment. In Point 6, Petitioner claims that his statements to his fellow [Alcoholics Anonymous] members constitute confidential communications, the use of which [to establish probable cause to arrest him and take his fingerprints (Point 5) ] violated Cox' rights under the First and Fourteenth Amendments.

This Court now summarizes the factual background of the conviction solely to the extent necessary to support discussion of these two issues. Petitioner, age twenty-one at the time of the crime, who had throughout his life suffered with a serious learning disability and personality disorder with borderline psychotic and anti-social traits, murdered Lakshman Rao Chervu and his wife Shanta Chervu in the early morning hours of December 31, 1988. The crime was committed in the bedroom of their single family residence at 36 Lincoln Street in Larchmont. The murder was particularly brutal, effected with a knife taken from the Chervu kitchen after Cox had broken into the house by breaking a windowpane. Mr. Cox had lived in that home until age seven, at which time his

parents moved to another residence about six-tenths of a mile away. .

In the evening of December 30, 1988, Petitioner along with two others had gone on a drinking spree at a local bar. They had consumed from a pitcher several portions of a drink known as a Kamikaze.[1] After midnight and in the early morning of December 31st they left the bar with Cox driving his mother's automobile. He drove off the road and the car crashed into a guardrail. The two fellow drinkers returned to the bar and Cox began to walk towards his parent's house where he resided (a distance of 2.8 miles) in the course of which he passed the Chervu home (2.2 miles from the accident) broke into the building and committed the murders. He left a fingerprint and a palm print at the scene of the crime. Psychiatric testimony adduced at trial was to the effect that in addition to his psychiatric problems previously mentioned, Mr. Cox was an alcoholic and suffered from an acute alcohol amnesic syndrome, or blackout, at the time of the crime. He walked to his family home after the crime and disposed of his bloody clothes, as well as the knife which he had stolen from the Chervu kitchen.

As may be imagined, this remained for some time an unsolved crime. When he awoke the next day, Cox heard the news of the crime, and that it had taken place in his former home. He had a history of parricidal impulses and he knew, notwithstanding his alcohol induced "blackout," that he was the killer.

On November 11, 1990, Petitioner joined the Harbor Island Chapter of Alcoholics Anonymous.[2] Alcoholics Anonymous was founded in 1935 in Akron, Ohio as an effort to help Alcoholics obtain sobriety. Initially AA was a self-help group which did not consider or represent itself as an established religion, but helped many Alcoholics, who continued to belong to and worship with their own churches or other religious groups while belonging to AA. In 1939 the founders published a text which set forth the "Twelve Steps of Recovery." This represents the core belief of AA, which in the ensuing years has been extremely successful internationally, with more than a million members in the United States alone.

The Twelve Steps must be accomplished one by one, beginning with the first step. A new member will be sponsored and assisted by one or more existing members of the organization. Members interact on a first name basis only. The entire relationship is both anonymous and confidential. Members are forbidden from telling outside, statements made at a meeting. The eighth step requires the new member to have "made a list of all persons we had harmed and became willing to make amends to them all." Step five, preliminary to step eight, required that the new member have "admitted to God, to ourselves, *and to another human being* the exact nature of our wrongs." (Emphasis added)

In compliance with this discipline imposed upon him by AA, Cox admitted to at

---

1. Kamikaze takes its name from Japanese suicide pilots during World War II who would crash their one-person aircraft directly into a battleship or similar target with the intention of accomplishing their own death as well as the destruction of the target. It is a mixed drink composed of vodka, triple-sec, and lime juice, unlikely to sharpen judgment and discretion.

2. Petitioner cites 42 U.S.C. § 290 dd–2, which provides for limited confidentiality of records of a substance abuse program or activity. This statute by its terms is limited to those programs or activities receiving direct or indirect federal assistance. There is no evidence in the record that the Harbor Island Chapter of AA receives such assistance.

least eight fellow AA members that he "believed" that he had committed the two murders in his former residence while he was blacked out from alcohol and that he had dreams about his possible involvement with the murder; that he had used a knife; that he had disposed of the knife and his bloodied clothes.

In late 1992 or early 1993, a woman member of AA, identified in the trial record as "Ms. H" met Petitioner through her membership in AA, and in February 1993 began to share an apartment with him and with one "Mr. R," another member of AA.[3] Ms. H revealed to her own psychologist that she knew of the crime. On his advice and on the advice of an attorney whom he obtained for her, the District Attorney was made aware of her knowledge and that of the other AA members, all of whom were interrogated by the authorities and in apparent violation of the confidentiality which AA holds out to its communicants, and possibly the psychologist's duty of confidentiality, corroborated the story. As a result of this information Petitioner was arrested and his fingerprints taken. As might be expected, they matched the fingerprint and palm print at the crime scene.

■ The doctrine of inevitable discovery cannot be applied in this case. Although Cox had been fingerprinted in the course of his military service, those prints ordinarily would not have been accessed in connection with the investigation. Accordingly, the fingerprints which tie Petitioner to the crime are a direct result of the disclosure to authorities of the communication which Petitioner had with his fellow members of AA.

■ Petitioner's argument is that his efforts to comply with the Twelve Steps are privileged and that communications in

furtherance of the discipline imposed by AA on its communicants may not be disclosed to his detriment. In light of § 4505 of the New York C.P.L.R. relating to confidential communications to clergy, Petitioner now contends that what he told his fellow members was privileged and if this statutory codification and extension of the priest/penitent privilege does not extend to such communications then the statute is unconstitutional as applied. In either case, he is entitled to relief on due process or equal protection grounds.

Section 4505 reads in relevant part as follows:

**Section 4505. Confidential Communication to Clergy Privileged.**

Unless the person confessing or confiding waives the privilege, a clergyman or other minister of any religion or duly accredited Christian Science practitioner shall not be allowed [to] disclose a confession or confidence made to him in his professional character as spiritual advisor.

The statute has its historical origin in the Roman Catholic sacrament in which a person privately confesses his or her sins to God, through a priest, in order to receive absolution. That priest by Canon law is required to maintain the confidentiality of the confession. Commentators agree that § 4504 "recognizes the societal value of encouraging communications of this nature and extends the privilege of the confidences to lay persons seeking spiritual advice from the clergy of any religion." Practice Commentary by Vincent C. Alexander, Book 7B of McKinney's Consolidated Laws of New York Annotated (1992).

The common law in New York recognized no privilege for confidential communications or confessions made to cler-

3. The Prosecutor and trial court honored the convention of anonymity.

gymen or other spiritual advisors. *Richardson on Evidence Tenth Ed., by Jerome Prince,* § 424. The initial New York statute granting a privilege was passed in 1876; since then, the privilege has been broadened by amendments adopted from time to time over the years.

■ In *People v. Carmona,* 82 N.Y.2d 603, 608–9, 606 N.Y.S.2d 879, 627 N.E.2d 959 (1993) the New York Court of Appeals held:

> Although often referred to as a "priest-penitent" privilege, the statutory privilege is not limited to communications with a particular class of clerics or congregants. Nor is it confined to "penitential admission[s] ... of a perceived transgression" or avowals made 'under the cloak of the confessional' (concurring opn. at 623, 624, quoting *Matter of Keenan v. Gigante,* 47 N.Y.2d 160, 166, 417 N.Y.S.2d 226, 390 N.E.2d 1151). On the contrary, in enacting CPLR 4505, the Legislature intended to recognize "the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance." (*Matter of Keenan v. Gigante* supra, at 166, 417 N.Y.S.2d 226, 390 N.E.2d 1151) without regard to the religion's specific beliefs or practices.
>
> While the privilege may have "ha[d] its origins in the Roman Catholic sacrament of Penance, in which a person privately confesses his or her sins to a priest [and t]he priest is enjoined by Church law ... to maintain the confidentiality of the confession." the New York statute is intentionally aimed at all religious ministers who perform "significant spiritual counseling which may involve disclosure of sensitive matters" (Alexander, Practice Commentaries, McKinney's Cons

Laws of NY, Book 7B, CPLR 4505, at 683). Indeed, the drafters of the current codification struck the concluding phrase from the predecessor provision, which made the privilege applicable to communications made "in the course of discipline, enjoined by the rules or practice of the religious body to which he belongs" (*see,* Civ Prac Act § 351), because the phrase was ambiguous and rendered it "doubtful whether the rule applies to any confessions other than those to a Catholic priest" (Second Preliminary Report of Advisory Comm on Prac and Pro, 1958 N.Y. Legis Doc No. 13, at 93). Accordingly, what is more appropriately dubbed the "cleric-congregant" privilege is applicable to ministers of all religions, most of which have no ritual analogous to that of the Catholic confession (*see,* Alexander, *op. cit.,* at 683). Despite the concurrence's "four canon" analysis, New York's test for the privilege's applicability distills to a single inquiry: whether the communication in question was made in confidence and for the purpose of obtaining spiritual guidance (*Matter of Keenan v. Gigante, supra,* at 166, 417 N.Y.S.2d 226, 390 N.E.2d 1151).

The Appellate Division did not deal with this issue except by its ordinary boilerplate phrase to the effect that all other issues were "either unpreserved for appellate review or without merit."[4] The Appellate Division brief of the People argued that no statutory or common law privilege attached to communications between members of Alcoholics Anonymous, and that "[i]t is a matter solely for the legislature, which has not chosen to endow AA communications with confidentiality." (Brief at p. 29) The Appellate Division must be

---

**4.** The sole issue addressed on appeal was whether the evidence established that peti-

tioner suffered from temporary insanity and therefore was not criminally responsible.

deemed to have adopted that argument. Indeed, the People also argued that "there was no evidence whatsoever that Alcoholics Anonymous is a religious organization as required by statute, or that another members is a clergyman or other member of any religion or duly accredited Christian Science practitioner."

This Court would agree were the issue an open one in this Circuit, with Respondent's arguments made in the same brief that "although there are religious underpinnings to the AA philosophy, AA is not a religion but rather a self-help organization designed to overcome the problems of alcoholism." Our Court of Appeals has subsequently held in the context of an Establishment Clause case that AA is a religion and that imposing attendance at AA meetings upon a criminal defendant violated the Establishment Clause by reason of the religious nature of the Twelve Steps. *Warner v. Orange County Department of Probation*, 115 F.3d 1068, *reaff'd* 173 F.3d 120 (2d Cir.1999). In *Griffin v. Coughlin*, 88 N.Y.2d 674, 683, 649 N.Y.S.2d 903, 673 N.E.2d 98 (1996), the New York Court of Appeals held that "Doctrinally and as actually practiced in the Twelve Step methodology, adherence to the AA fellowship entails engagement in religious activity and religious proselytization:

> members are urged to accept the existence of God as a Supreme Being, Creator, Father of Light and Spirit of the Universe. In 'working' the Twelve Steps, participants become actively involved in seeking such a God through prayer, confessing wrongs and asking for removal of shortcomings. These expressions and practices constitute as a matter of law religious exercise for establishment clause purposes."

*Griffin,* 88 N.Y.2d at 683, 649 N.Y.S.2d 903, 673 N.E.2d 98.

The record before this Court shows that in addition to the numerous religious references in the Twelve Steps, meetings of AA are closed with a recitation of The Lord's Prayer. There is no principled basis for a court to hold that AA is a religion for Establishment Clause purposes, and yet that disclosure of wrongs to a fellow member as ordained by the Twelve Steps does not qualify for purposes of a privilege granted to other religions similarly situated. Clearly it is possible as a matter of Constitutional law to have and to practice a religion without having a clergyman as such, or where all members exercise the office of clergyman to the extent of receiving confessions or confidences.

If § 4505 of the New York C.P.L.R. be construed as expressing an endorsement of the traditionally recognized forms of religious expression over a less conventional religious expression, the state has violated the Establishment Clause of the First Amendment to the United States Constitution. Similarly, to the extent that a Free Exercise issue is involved, if the state is treating AA meetings with less protection than any other form of religious communication which carries assurances of confidentiality, a Constitutional violation also exists.

This issue was adequately tendered to the Appellate Division on appeal and the Petitioner cannot be dismissed on claims of non-exhaustion. This is particularly true in light of Respondent's brief in the Appellate Division where the People argue that AA is not a religion and that disclosures made in furtherance of its doctrines are not privileged under § 4505. The argument is sufficient notice since all Judges are well aware of the Constitutional issues present when religion intersects with governmental action.

The point is critical because but for the violation of § 4505 the record is clear that

the People would never have identified the fingerprint and palm print, which properly should have been suppressed as "fruit of the poison tree."

The numerous remaining challenges to the conviction Points 1 through 5 of the Petition have been considered by this Court to the extent that any of them alone or together arise to a Constitutional level. They do not involve a decision contrary to or involving an unreasonable application of Federal Law, nor are they based on an unreasonable determination of the facts in light of the evidence which was before the state court, and are lacking in merit.

### Conclusion

The Petition for the writ is granted. The issuance thereof is stayed on the Court's own motion pending appellate finality.

SO ORDERED.