# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 12-2531

———————————————

Randall Jackson

*Plaintiff - Appellant*

v.

Jay Nixon, Attorney General; Larry Crawford, Director of MO DOC; Bill Burgess, WRDCC Warden; Collins, Superintendent I; Furgensond, C A A; Linda Reaidon, Functional Unit Manager; Tom Clement, Assistant Director of Adult Institution; Salsbury, Program Director; Miller, Head Counselor; Blane, Institutional Parole Officer; Tyler, Caseworker; Reynolds, Assistant Counselor; Unknown Director, of KCCC

*Defendants - Appellees*

———————

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

———————

Submitted: September 26, 2013
Filed: March 28, 2014

———————

Before WOLLMAN, SMITH, and KELLY, Circuit Judges.

———————

KELLY, Circuit Judge.

Randall Jackson appeals the dismissal with prejudice of his lawsuit brought pursuant to 42 U.S.C. § 1983 against various state officials involved in administering and supervising the Western Reception, Diagnostic, and Correctional Center

(WRDCC) in St. Joseph, Missouri, while he was incarcerated there. As an atheist, Jackson challenged the WRDCC's Offenders Under Treatment Program (OUTP) as violating his rights under the First Amendment. The district court, required under the Prison Litigation Reform Act to screen prisoner complaints prior to service, dismissed the complaint as failing to state a claim under which relief may be granted. 28 U.S.C. § 1915A(b)(1). While Jackson named in his complaint several officials as defendants in their individual capacities, the only claims remaining on appeal concern Larry Crawford (Director of the Missouri Department of Corrections [MDOC]), Bill Burgess (WRDCC Warden), and Ms. Salsbury (WRDCC OUTP Director). With jurisdiction under 28 U.S.C. § 1291, we reverse the dismissal of Jackson's complaint and remand to the district court for further proceedings.

## I. Background

As part of a stipulation with the MDOC Board of Probation and Parole, Randall Jackson, an atheist, was required to attend the Offenders Under Treatment Program for substance abuse. Appendix (App.) at 22. Jackson understood he was required to complete this program to be eligible for early release on parole. In his complaint, Jackson said the program "had required meetings [and] invoked religious tenets by using the serenity prayer and religious meditations." Id. at 7. When Jackson objected to the prayer, Salsbury and other staff advised him to "act as if," a term used in the program, meaning to "assume a role or attitude even if you don't feel like it" and further defined as "[a] tool used to assist one in 'trying on' new patterns of thought and behavior." Id. at 9 (citing Kansas City Community Center, 180-day Therapeutic Community Substance Abuse Treatment Programs Resident Handbook, rev. January 2006). Salsbury and staff suggested that Jackson "use God as an acronym for 'good orderly direction.'" Id. The complaint further stated: "It is my assertion that I was being coerced by and through an atmosphere designed and intended to change or alter my thinking and behavior. That it would induce conformity by adding pressure and

leverage through the hope and desire of achieving a 'Placement on Parole.'" Id. at 9–10.

Jackson pursued a grievance, seeking to be transferred to a secular treatment program. His grievance was denied, and Jackson appealed to the MDOC Division of Adult Institutions. MDOC denied the appeal as well. Although the timing and circumstances are unclear, Jackson ultimately left the program. Jackson believes he was denied an early release on parole for failure to complete OUTP; he included with his complaint a document from the MDOC Board of Probation and Parole, which states: "Because you have not completed a Board stipulated treatment program, the Board is denying your credit release date. Your previously scheduled release date will remain in effect." Id. at 27. The record at this stage contains no further information regarding the impact of this MDOC decision on Jackson's sentence. Jackson filed suit pro se on January 6, 2012, though he is represented by counsel on appeal. As part of his requested relief, Jackson seeks the removal of "Alcoholics Anonymous [AA] and other religious components" from MDOC treatment programs. Id. at 7–8. In dismissing Jackson's suit with prejudice, the district court found that his claims failed because "personal involvement is a prerequisite to liability under § 1983," and "withdrawing voluntarily from a program does not create a constitutional right to an early release."

## II. Discussion

We review de novo the district court's dismissal of a prisoner's claim under 28 U.S.C. § 1915A, "accepting as true all of the factual allegations contained in the complaint and affording the plaintiff all reasonable inferences that can be drawn from those allegations." Reynolds v. Dormire, 636 F.3d 976, 979 (8th Cir. 2011) (reversing pre-service dismissal of a pro se prisoner's claim under 42 U.S.C. § 1983). In evaluating whether a pro se plaintiff has asserted sufficient facts to state a claim, we hold "a *pro se* complaint, however inartfully pleaded, . . . to less stringent standards

than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (quotation omitted); see also Whitson v. Stone Cnty. Jail, 602 F.3d 920, 922 n.1 (8th Cir. 2010).

## A. First Amendment Claim

The district court's disposition of Jackson's First Amendment claim—"withdrawing voluntarily from a program does not create a constitutional right to an early release"—implicates two issues. We address first the question of Jackson's withdrawal, then any constitutional rights at stake.

The district court concluded, and the state argues on appeal, that Jackson voluntarily withdrew from the substance abuse program, and that voluntary withdrawal is fatal to his case. Jackson claims, however, that "[d]ue to the religious components of the program and lack of any foreseeable remedy, my choices were to withdraw from the program or remain exposed to those religious elements." App. at 10. Whether Jackson's withdrawal from the program was indeed voluntary (a word Jackson never uses in his complaint) or was the result of state-sponsored coercion is yet to be determined. See Inouye v. Kemna, 504 F.3d 705, 714 (9th Cir. 2007) ("The Hobson's choice [parole officer] Nanamori offered Inouye—to be imprisoned or to renounce his own religious beliefs—offends the core of Establishment Clause jurisprudence."). At this stage of the litigation, dismissal of the complaint on this ground was premature.

We next evaluate Jackson's constitutional claim. He alleges that being required to attend and complete a nonsecular substance abuse treatment program in order to be eligible for early parole violates the Establishment Clause of the First Amendment. In Lee v. Weisman, 505 U.S. 577 (1992), the Supreme Court emphasized that, "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." Id. at 587, 588–99 (recognizing that

-4-

unconstitutional coercion may be exercised both directly, such as by mandatory attendance at a religious exercise, and indirectly).[1] The Eighth Circuit has indicated that the <u>Lee</u> coercion test should also be applied in the prison context to assess the constitutionality of requiring or conditioning benefits on attendance at potentially religious treatment programs. See <u>Munson v. Norris</u>, 435 F.3d 877, 880–81 (8th Cir. 2006) (citing <u>Lee</u> when instructing lower court to evaluate prisoner's First Amendment claim under the Establishment Clause, which "prohibits government from coercing anyone to participate in religion or its exercise") (also citing as cases applying <u>Lee</u> in the prison context <u>Warner v. Orange Cnty. Dep't of Prob.</u>, 115 F.3d 1068 (2d Cir. 1996); <u>Kerr v. Farrey</u>, 95 F.3d 472 (7th Cir. 1996); <u>Griffin v. Coughlin</u>, 673 N.E.2d 98 (N.Y. 1996), *cert. denied*, 519 U.S. 1054 (1997)).

In evaluating a plaintiff's claim "that the state is coercing him or her to subscribe to religion generally, or to a particular religion," the Seventh Circuit in <u>Kerr v. Farrey</u> described a three-step inquiry: "first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious or secular?" 95 F.3d at 479. The Ninth Circuit has since adopted the <u>Kerr</u> criteria in evaluating this type of claim. See <u>Inouye</u>, 504 F.3d at 713; see also <u>Warner</u>, 115 F.3d at 1075. We agree that <u>Kerr</u> is "particularly useful" "with regard to determining

---

[1] In considering this pre-service dismissal of a pro se complaint, with a record that we believe is simply too sparse for much fact finding, it is sufficient for us to address Jackson's claim of direct coercion: that he was required by his parole stipulation to attend OUTP. In doing so, we do not foreclose the possibility that he may also state a claim of indirect coercion based on the use of potential early parole as an incentive to complete a nonsecular substance abuse treatment course and the religious observance therein. See, e.g., <u>DeStefano v. Emergency Hous. Grp., Inc.</u>, 247 F.3d 397, 412 (2d Cir. 2001) ("Government and those funded by government 'may no more use social pressure to enforce orthodoxy than [they] may use more direct means.'" (quoting <u>Lee</u>, 505 U.S. at 594, and citing <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 312 (2000))).

whether there was governmental coercion of religious activity." Inouye, 504 F.3d at 713. Accordingly, we will apply the Kerr court's three-part formulation of the Lee coercion test to Jackson's First Amendment claim of governmental coercion.

In Jackson's case, no one disputes that the state acted; thus, Jackson has met the first prong. As for the third prong, the district court did not address whether the program was religious or secular, although the state's appellate brief did not refute Jackson's statement that OUTP contains some religious content. At oral argument, state's counsel was "willing to recognize that there are religious aspects to the traditional AA program," but counsel did not know whether OUTP included such aspects beyond Jackson's statements in his complaint regarding the Serenity Prayer and religious meditation. We assume the truth of Jackson's allegations for purposes of reviewing a pre-service dismissal, and we accept that OUTP contained some religious content. At the core of the dispute, therefore, is the second prong of the Kerr test: whether the state's action constituted coercion.

The state argues that participation in OUTP was optional and, as a result, not coerced. Assuming the truth of the facts pled in Jackson's pro se complaint, however, he believed himself required to complete it based on a parole stipulation. The parties agree that even if Jackson had completed the substance abuse treatment program, he would not have been guaranteed early parole. Under Missouri law, compliance with the parole stipulation meant that Jackson's case would be referred to the Missouri Board of Probation and Parole, and the Board would then consider his potential early release. Mo. Rev. Stat. §§ 217.364, 217.690 (2013). Jackson's pro se complaint and attached documents do not reveal whether this is the only route to early parole or how

many OUTP participants receive it.[2]  Jackson's progress toward early parole did, however, stop when he left the substance abuse treatment program.

Based on the existing record, it is also unclear whether the state would have permitted Jackson to remain in, and graduate from, OUTP if he refrained from actively participating in only the faith-based portions of the curriculum.  Even if the state had allowed Jackson to sit quietly during the prayers and other religious components, however, the state's action may still amount to coercion.  See Warner, 115 F.3d at 1076  ("The fact that Warner managed to avoid indoctrination [by not actively participating] despite the pressure he faced does not make the County's program any less coercive, nor nullify the County's liability."); Kerr, 95 F.3d at 474 (finding coercion even though "inmates were required to 'observe' the NA [Narcotics Anonymous] meetings," "not required to 'participate'").

While inmates have no constitutional right to early parole, Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979), Jackson does have the right to be free from unconstitutional burdens when availing himself of existing ways to access the benefit of early parole.  The fact that Jackson did not have a constitutional right to, or statutory guarantee of, early parole does not preclude him from stating a claim of unconstitutional coercion.  "It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice."  Lee, 505 U.S. at 596; Kerr, 95 F.3d at 474–75 (state "impermissibly coerced inmates to participate in a religious program" when the "penalty" for

---

[2]At oral argument, counsel referred to good-time credits as another way to receive early parole.  At this early stage, however, the record does not reflect what additional early parole programs may exist, if any; how good-time credits interact with the early parole available through OUTP; and whether Jackson might have been eligible for early parole via good-time credits as well.

nonattendance at NA meetings was a potential "adverse impact on an inmate's security risk rating" and on his parole eligibility, though no inmate had ever received the risk rating penalty); Griffin, 673 N.E.2d at 106 (state's requirement that inmates attend substance abuse treatment program's AA meetings to be eligible for the jail's discretionary Family Reunion Program was coercive). The Missouri Board of Probation and Parole may have discretion in deciding whether to grant early parole to an OUTP graduate, but that fact alone does not shield the defendants from potential liability for implementing a program that is alleged to violate the First Amendment.

We conclude, based on the allegations in the complaint, that Randall Jackson has pled facts sufficient to state a claim that a parole stipulation requiring him to attend and complete a substance abuse program with religious content in order to be eligible for early parole violates the Establishment Clause of the First Amendment.

## B. Personal Involvement

To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his "failure to properly supervise and train the offending employee" caused the constitutional violation at issue. Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001) (quotation omitted); Crooks v. Nix, 872 F.2d 800, 804 (8th Cir. 1989). Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in "creating, applying, or interpreting a policy" that gives rise to unconstitutional conditions. Bonner v. Outlaw, 552 F.3d 673, 679 (8th Cir. 2009) (citing Trudeau v. Wyrick, 713 F.2d 1360, 1367 (8th Cir. 1983)). In requiring a plaintiff to allege that each defendant was personally involved in the deprivation of

his constitutional rights, we assess each defendant relative to his authority over the claimed constitutional violation.

Jackson alleged that as MDOC Director, Crawford "knew or should have known of the changes of Constitutional policy and how they [affected] inmate[s] like me under his jurisdiction." App. at 18. He asserted that WRDCC Warden Burgess (identified in the complaint only as the warden) "knew or should have know[n] changes in Constitutional matters concerning the facility in which he presides." Id. Moreover, "[i]f he would have taken action," Jackson may not have withdrawn from the program. Id. He stated that Salsbury, director of the WRDCC treatment program, suggested ways for him to remain in the religious program that might conflict less with his atheism, and that as director, "she at the very least could have allowed me not to attend the religious elements of the program." Id. at 19.

Jackson, represented by counsel on appeal, has supplemented the allegations in his complaint with legal authority for defendants' control over the prison system. In reviewing the dismissal of a pro se complaint, we construe such complaints liberally, but we do not address legal or factual claims presented for the first time on appeal. Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004). We distinguish, however, between adding claims on appeal and fleshing out claims that were initially inartfully pled. "When we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." Id. at 915. Taking a similar approach to our de novo review, we find Jackson's arguments on appeal are properly before us, as they provide additional legal support for the claims he made at the district court as a pro se litigant.

Jackson asserted that by virtue of their positions within the prison system, Crawford and Burgess can be held liable under § 1983. The authority of the state DOC director to make prison-wide policy decisions may be sufficient to give rise to liability under § 1983. We have found a DOC director may be "responsible for his own failure to act," based on his statutory duty to administer the Department of Corrections and "supervise the administration of all institutions, facilities and services under the Department's jurisdiction" and his authority to change the challenged policies. Messimer v. Lockhart, 702 F.2d 729, 732 (8th Cir. 1983) (quoting Ark. Stat. Ann. § 46-105(a) (1977)). Moreover, an allegation that the DOC director authorized an unconstitutional policy may be sufficient to state a claim "for actions allegedly taken directly by" the director. Cooper v. Schriro, 189 F.3d 781, 784 (8th Cir. 1999).

Under Missouri law, "[t]he general supervision, management and control of the department of corrections shall be in the director of corrections." Mo. Rev. Stat. § 217.025(1) (2013). As such, MDOC Director Crawford is required to "establish the duties and responsibilities of employees of the department" and "supervise their work assignments." Mo. Rev. Stat. § 217.025(3) (2013). He is "responsible for the implementation of uniform policies and procedures governing offenders and staff," and he must "make and enforce such rules, regulations, orders and findings as the director may deem necessary for the proper management of all correctional centers and persons subject to the department's control." Mo. Rev. Stat. §§ 217.025(3), (6) (2013). MDOC is statutorily required to "establish rules determining how, when and where an offender shall be admitted into or removed from the [Offenders Under Treatment] program." Mo. Rev. Stat. § 217.364(1) (2013); see also Mo. Rev. Stat. § 217.364(4) (2013) (the program's curriculum "may include education, treatment and rehabilitation programs"). Given Crawford's statutory duties, including those associated with administration of the OUTP, Jackson's complaint alleged sufficient personal involvement as to MDOC Director Crawford.

To state a claim against Warden Burgess, Jackson must plead facts to show that Burgess was directly involved in making, implementing or enforcing a policy decision that "create[d] unconstitutional conditions." Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985). Our case law is clear that the warden's general supervisory authority over prison operations does not make him liable under § 1983. Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007); Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987). We note that personal involvement may be assessed differently depending on the alleged constitutional violation at issue. In cases regarding prison violence, for instance, it can be difficult to demonstrate the warden's "knowledge of, or connection with" individual incidents between guards and prisoners or among prisoners. Messimer v. Lockhart, 702 F.2d 729, 732 & n.4 (8th Cir. 1983) (citation omitted) (contrasting "isolated instances of alleged mistreatment" with "policy decisions made by those in charge of the prison"). Here, although Jackson challenges the curriculum of a treatment program—the choice of which was inherently a policy decision—and its effect on him, his conclusory statement that Warden Burgess "knew or should have known" of the alleged First Amendment violation is insufficient. Instead, Jackson must plead facts that plausibly show direct involvement by the warden in the formation, implementation, or enforcement of that policy, which at this stage of the litigation he has failed to do.

Jackson's claims regarding Salsbury's involvement are more specific than his statements regarding the other defendants. In particular, he alleged that as director of the treatment program, she could have allowed him to avoid the religious portions of the program but still remain enrolled in order to comply with his parole stipulation. App. at 19. The scope of her authority as to the OUTP curriculum and inmates' participation in it is unclear. Even if she did not determine the OUTP curriculum, however, the claim concerns her ability to help ameliorate the constitutional violation alleged. See Lomholt v. Holder, 287 F.3d 683, 684 (8th Cir. 2002) (First Amendment Free Exercise claim stated when prisoner alleged that one defendant "refused to help

-11-

him when he told her" that another defendant had told him to "'drop the subject' of being in the hole" for his religious fasting). Affording Jackson reasonable inferences from the facts in his complaint, we find that he has plausibly alleged Salsbury's personal involvement.

In sum, Jackson has pled facts sufficient to show the personal involvement required for Crawford and Salsbury to bear § 1983 liability. As to Burgess, at this stage of the litigation, he has not.

### III. Conclusion

We hold that the district court erred in dismissing with prejudice Jackson's claims against Crawford, Burgess, and Salsbury. Jackson's complaint alleged facts sufficient to state a plausible claim against Crawford and Salsbury. We therefore vacate the district court's dismissal order as against these three defendants; we grant Jackson leave to amend his complaint as appropriate; and we remand for further proceedings regarding the claims against Crawford and Salsbury.

SMITH, Circuit Judge, dissenting.

I respectfully dissent. I would affirm the district court's dismissal of Jackson's complaint because Jackson has failed to state a First Amendment claim where (1) participation in the OUTP was not mandatory, and (2) he was never punished, threatened with punishment, or otherwise subjected to a significant penalty after withdrawing from the OUTP.

### I. *Background*

Jackson filed suit under 42 U.S.C. § 1983 against several state defendants, alleging the violation of his First Amendment rights because the substance abuse

treatment program, in which Jackson agreed to participate, contained religious elements. His pro se complaint provides, in relevant part:

> While in the Dep't of Corr's I was stipulated by the Board of Probation and Parole to a substance abuse treatment program (program). The program had required meetings invok[ing] religious tenets by using the serenity prayer and religious meditations. I am an Atheist and in being so these religious elements upset and offended me and my beliefs. My efforts to resolve these issues included discussions with my primary counselor Ms Miller, her assistant Ms Reynolds and the Director of the . . . program Ms Salsbury. Their partisan advice was to "act as if" the Theraputic Community (TC) handbook defines this as: "to assume a role or attitude even if you don't feel like it. A tool used to assist one in "trying one" new patterns of thought and behavior" page 19 (Kansas City Community Center's, 180 Day Therap[eutic] Community Substance Abuse Treatment Programs Resident Handbook) (revised January 2006)[.] They also suggested that I use God as an acronym for "good orderly direction." Neither seemed viable to me. I sent a kite . . . to the Institutional Parole Officer Mr Blane asking to discuss sending a letter to the parole board concerning these r[e]ligious issues. Four days later the kite was returned with a flat refusal, would not even talk to me about it. I met the caseworker Ms Tyler, I explained my situation I then requested an Informal Resolution Request (IRR). Later I filed that IRR with her Asst. Mr Furg[enson]. It is my assertion that I was being coerced by and through an atmosphere designed and intended to change or alter my thinking and behavior. That it would induce conformity by adding pressure and leverage through the hope and desire of achieving a "Placement on Parole." Due to the religious components of the program and lack of any foreseeable remedy, my choices were to withdraw from the program or remain exposed to those religious elements. I came to a point where I was no longer willing to be subjected to this form of coercion and allow the inculcation of religious theology, all in the guise of a benefit. For me to remain in that program would have been the equivalent to denouncing my beliefs and my right to them!

In a "Time Line Reference Sheet" attached as an exhibit to his complaint, Jackson stated that after being "[s]creened for treatment," he received a "decision from the parole board, *stipulated* to treatment at Western Diagnostic Correctional Center (WRDCC)." Jackson does not explain the circumstances surrounding his "stipulation" to treatment; however, the defendants' counsel confirmed that this treatment was not required by his sentence. Jackson's counsel also conceded that participation in the OUTP is not required.[3]

Also included with his complaint was a document from the MDOC Board of Probation and Parole ("MDOC document"), which provided that Jackson was "scheduled for release from confinement on 1/20/2008." The document explained that Jackson's "time credit release consideration has been denied." It also stated that because Jackson failed to "complete[] a Board stipulated treatment program, the Board is denying [Jackson's] credit release date." As a result, Jackson's "previously scheduled release date . . . remain[ed] in effect."[4]

---

[3]At oral argument, Jackson's counsel was asked whether "participation in the program is required." Counsel replied, "No, it's not. It's not required." And, when the defendants' counsel was asked whether participating in the program was "a condition . . . [that was] a part of [Jackson's] sentence," the defendants' counsel replied:

> No, it was not. He had a four-year sentence, and he had to serve four years. He had the opportunity to get out early . . . for good behavior and all the other ways that inmates can potentially be paroled early. This was yet another avenue in which the parole board might exercise discretion.

[4]At oral argument, the defendants' counsel was asked whether there are "other avenues for early release," aside from the OUTP program, to which counsel replied:

> There are. Particularly, I think it's called good times credits . . . for every day that you go without an infraction in the prison you get a day off of your sentence, depending on what the sentence is. Some sentences you are required to spend at least 40 percent of the sentence in prison. More

-14-

II. *Discussion*

Jackson argues, among other things, that the district court erroneously dismissed his complaint for failure to state a claim because he has "sufficiently alleged that he was faced with an unlawful Hobson's choice: embrace the program's religious elements or be denied an opportunity for early release on parole." According to Jackson, precedent from our sister circuits holds that this "choice is a violation of the Establishment Clause because it amounts to coercion to embrace religious notions."

The only apposite case from this circuit concerning a prisoner's purported coercion to participate in a faith-based program and recite the "serenity prayer" is *Munson v. Norris*. *See Munson v. Norris*, 67 F. App'x 383 (8th Cir. 2003) (unpublished per curiam) ("*Munson I*"); *Munson v. Norris*, 435 F.3d 877 (8th Cir. 2006) (per curiam) ("*Munson II*"); *Munson v. Norris*, 375 F. App'x 638 (8th Cir. 2010) (unpublished per curiam) ("*Munson III*"). That case arose

> from an ADC *parole condition* which *required* Munson to attend a treatment program, the Reduction of Sexual Victimization Program ("RSVP"), for inmates who exhibited sexual deviancy. The RSVP included weekly meetings that followed "The Twelve Steps of Alcoholics Anonymous Adapted for Sexual Addicts" in their discussions. While enrolled in the RSVP, Munson refused to recite the serenity prayer at the conclusion of the group meetings. Munson was eventually terminated from the program and filed suit, alleging, among other claims, a violation of the Establishment Clause.

---

> serious offenses you have to spend at least 85 percent. I believe these were ones he had to spend at least 40 percent. And that's where . . . that conditional release date . . . in January 2008 comes in. That's . . . less than his four years that he was sentenced to serve. That's wh[en] he could get out if he had good behavior the entire time.

In *Munson II* we remanded, holding that the district court had "wrongly analyzed the First Amendment claim under the Free Exercise Clause instead of the Establishment Clause" and instructing the district court to "decide whether requiring Mr. Munson at the RSVP meetings to recite the serenity prayer was in violation of the Establishment Clause." 435 F.3d at 880–81 (citing *Warner v. Orange County Dep't of Prob.*, 115 F.3d 1068, 1074–76 (2d Cir. 1996); *Kerr v. Farrey*, 95 F.3d 472, 476–80 (7th Cir. 1996); *Griffin v. Coughlin*, 88 N.Y.2d 674, 649 N.Y.S.2d 903, 673 N.E.2d 98, 101–05 (1996)).

On remand, the district court instructed the jury to find that Munson had been coerced to recite the serenity prayer, in violation of Munson's Establishment Clause rights, if the following was proven by a preponderance of the evidence: (1) the ADC required RSVP participants to recite the serenity prayer; (2) the ADC required Munson to recite the serenity prayer; (3) *the ADC punished or threatened to punish Munson for refusing to recite the serenity prayer*; and (4) Munson was damaged as a result. Munson's counsel did not object to these instructions, proffer any additional instructions, or argue that the district court had not complied with our mandate in *Munson II.*

*Munson III*, 375 F. App'x at 639–40 (emphasis added).

In *Munson III*, this court applied plain error review and concluded that, "[r]egarding the first three elements of the district court's instruction, . . . the district court adequately complied with our mandate because determinations concerning whether (1) Munson and other RSVP participants were actually required to recite the prayer and (2) Munson *was punished* for refusing to recite the prayer, *were necessary to the question of whether Munson's Establishment Clause rights were violated.*" *Id.* at 641 (citing *Lee*, 505 U.S. at 587 ("It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise . . . .") ; *Kerr*, 95 F.3d at 479 (finding coercion

-16-

when inmates were "required" to attend a treatment program and were "subject[ed] to significant penalties" upon refusal)).

In *Munson II*, in remanding to the district court for an analysis of Munson's claim under the Establishment Clause, we relied on three cases: *Warner*, *Kerr*, and *Griffin*. 435 F.3d at 880–81 (citing *Warner*, 115 F.3d at 1074–76; *Kerr*, 95 F.3d at 476–80; *Griffin*, 673 N.E.2d at 101–05).

In *Warner*, a *special condition* of Warner's probation was to "'attend Alcoholics Anonymous [A.A.] at the direction of [his] probation officer.'" 115 F.3d at 1070 (second alteration in original). At the direction of his probation officer, Warner attended A.A. meetings. *Id*. Warner complained to his probation officer "that, as an atheist, he found the religious nature of the A.A. meetings objectionable." *Id*. Nevertheless, "[t]he probation officer instructed Warner to continue his attendance." *Id*. A few months later, the probation officer "determined that Warner lacked sufficient commitment to the program; he directed Warner to attend 'Step meetings' and to seek another more advanced A.A. member as a 'sponsor' to give him guidance and encourage his adherence to the program." *Id*. "[T]he program Warner was *required* to attend involved a substantial religious component." *Id*. (emphasis added). Following a bench trial, the district court concluded that "compelling Warner to attend the program violated the Establishment Clause." *Id*.

On appeal, the Second Circuit held that "forcing Warner to attend Alcoholics Anonymous . . . violate[s] the First Amendment's Establishment Clause." *Id*. at 1074. Based on the record, "no doubt" existed that "Warner was coerced into participating in these religious exercises by virtue of his probation sentence. Neither the probation recommendation, nor the court's sentence, offered Warner *any choice* among therapy programs." *Id*. (emphasis added). Instead, "*[o]nce sentenced*, Warner had little choice but to attend the A.A. sessions. If Warner had failed to attend A.A., he would have

been *subject to imprisonment* for violation of probation." *Id*. (emphases added). The *Warner* court relied on *Griffin* and *Kerr* in reaching its decision, stating:

> In circumstances similar to our case, the New York Court of Appeals recently reached the same conclusion. *Griffin v. Coughlin*, 88 N.Y.2d 674, 649 N.Y.S.2d 903, 673 N.E.2d 98 (1996), *cert. denied*, 519 U.S. 1054, 117 S. Ct. 681, 136 L. Ed. 2d 607 (1997). In *Griffin*, the New York court held that a prisoner's family visiting privileges may not be conditioned on participation in a treatment program that adopts the "religious oriented practices and precepts of Alcoholics Anonymous." *Id*. at 904, 673 N.E.2d 98. The court emphasized that it was not proscribing A.A. programs offered to prisoners on a voluntary basis. *Id*. at 915, 673 N.E.2d 98. It was the coercive circumstances, *conditioning a desirable privilege on the prisoner's participation in a religious program, without alternative*, that drove the New York court to find a violation of the Establishment Clause. Similarly, the Seventh Circuit has ruled recently that where inmates were *required to attend* a substance abuse program with explicit religious content *on pain of being rated a higher security risk and suffering adverse parole effects*, the state impermissibly coerced participation in a religious program in violation of the Establishment Clause. *Kerr v. Farrey*, 95 F.3d 472 (7th Cir.1996) ("[I]n general, a coercion-based claim indisputably raises an Establishment Clause question." *Id*. at 479).

*Id*. (emphases added); *see also Kerr*, 95 F.3d at 479 ("On the record as it comes to us, it is also undisputed that Kerr was subject to significant penalties if he refused to attend the NA meetings: classification to a higher security risk category and adverse notations in his prison record that could affect his chances for parole.").

In addition to *Warner, Griffin*, and *Kerr*, the Ninth Circuit has held that "requiring a parolee to attend religion-based treatment programs violates the First Amendment." *Inouye*, 504 F.3d at 712. In *Inouye*, "Inouye charge[d] that . . . his parole officer . . . violated the Establishment Clause by requiring Inouye to attend

-18-

Alcoholics Anonymous/Narcotics Anonymous ('AA/NA') meetings *as a condition of his parole*." *Id.* at 709 (emphasis added). "Inouye's conditions of parole gave [his parole officer] authority to *order him* into a drug treatment program. The conditions emphasized that '[f]ailure to participate in your treatment and abide by the rules of the program may be considered evidence that you are refusing to participate in the program.'" *Id.* at 710 (second alteration in original) (emphasis added). Ultimately, the probation officer ordered Inouye to participate in the program. *Id.* Although Inouye remained in the program for a few months, he "refused to participate and was terminated." *Id.* As a result of the termination, the parole officer issued a warrant for Inouye's arrest for violating the conditions of his parole. *Id.* The state court revoked Inouye's parole. *Id.*

The district court granted summary judgment to the parole officer based on qualified immunity. *Id.* The Ninth Circuit reversed, finding it "essentially uncontested that requiring a parolee to attend religion-based treatment programs violates the First Amendment." *Id.* at 712. The court adopted *Kerr*'s reasoning to determine "whether there was governmental coercion of religious activity." *Id.* at 713. "*Kerr* proceeded sequentially as follows: 'first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious rather than secular?'" *Id.* (quoting *Kerr*, 95 F.3d at 479). In *Inouye*, the court found that the parole officer acted in his official state capacity and ordered participation. *Id.* The court also found that "the action was clearly coercive: Inouye could be *imprisoned* if he did not attend and he was, in fact, ultimately returned to prison in part because of his refusal to participate in the program." *Id.* (emphasis added). Finally, neither party disputed that the program was "substantially based in religion." *Id.* The court determined that "attendance in [the AA] program may not be coerced by the state. The Hobson's choice [the parole officer] offered Inouye—to be *imprisoned* or to renounce his own religious beliefs—offends the core of Establishment Clause jurisprudence." *Id.* at 714 (emphasis added); *see also Hazle v. Crofoot*, 727 F.3d 983, 986 (9th Cir. 2013)

(remanding to the district court for a new trial on the issue of damages where the plaintiff, an atheist, "was forced as a condition of parole to participate in a residential drug treatment program that required him to acknowledge a higher power").

The allegations set forth in Jackson's complaint differ markedly from the aforementioned cases and show, as a matter of law, that the coercion element is lacking. *See Kerr*, 95 F.3d at 479. First, Jackson has not shown that his participation in the OUTP was mandatory. *See Warner*, 115 F.3d at 1070 (stating that the prisoner "was required to attend" meetings under his sentence); *Kerr*, 95 F.3d at 479 (involving inmates required to attend a substance abuse program); *Griffin*, 673 N.E.2d at 110 (indicating that the court was not proscribing A.A. programs available to prisoners on a voluntary basis); *Inouye*, 504 F.3d at 712 (requiring prisoner to attend A.A. meetings "as a condition of his parole"). Jackson's counsel conceded at oral argument that participation in the OUTP is not required. Furthermore, the defendants' counsel confirmed that Jackson's participation in the OUTP was not required by his sentence.[5]

---

[5]The "Time Line Reference Sheet" provides that Jackson received a "decision from the parole board, *stipulated* to treatment at Western Diagnostic Correctional Center (WRDCC)." Likewise, the MDOC document stated that the Board was denying Jackson's credit release date because Jackson failed to "complete[] a Board stipulated treatment program." Jackson's complaint does not discuss the circumstances surrounding this "stipulation." But the plain meaning of the word "stipulate" indicates that Jackson agreed to entering the OUTP. "Stipulate" means to "lay down as a condition of an agreement; [to] require by contract; . . . to specify or arrange an agreement . . . to guarantee or promise (something) in an agreement." The American Heritage Dictionary 1767 (3rd ed. 1992). The legal term "stipulation" is defined as "[a] material condition or requirement in an agreement . . . [a] voluntary agreement between opposing parties concerning some relevant point." Black's Law Dictionary 1550 (9th ed. 2009). And, as explained *supra*, Jackson's counsel conceded that participation in the program is not mandatory.

Second, Jackson has not shown that he suffered a punishment, threat of punishment, or significant penalty upon his withdrawal from the program. *See Munson III*, 375 F. App'x at 641 ("Regarding . . . the district court's instruction, we conclude that the district court adequately complied with our mandate because [a] determination[] concerning whether . . . Munson was punished for refusing to recite the prayer . . . [was] necessary to the question of whether Munson's Establishment Clause rights were violated."); *Kerr*, 95 F.3d at 479 ("On the record as it comes to us, it is also undisputed that Kerr was subject to significant penalties if he refused to attend the NA meetings: classification to a higher security risk category and adverse notations in his prison record that could affect his chances for parole.").

As to the OUTP that Jackson participated in, Missouri law provides, in relevant part:

> This program shall be used as an intermediate sanction by the department. The program may include education, treatment and rehabilitation programs. If an offender successfully completes the institutional phase of the program, the department shall notify the board of probation and parole within thirty days of completion. *Upon notification from the department that the offender has successfully completed the program, the board of probation and parole may at its discretion release the offender on parole as authorized in subsection 1 of section 217.690.*

Mo. Rev. Stats. § 217.364, subsection 4 (emphasis added). In turn, subsection 1 of Missouri Revised Statutes § 217.690 provides:

> When in its opinion there is reasonable probability that an offender of a correctional center can be released without detriment to the community or to himself, *the board may in its discretion* release or parole such person except as otherwise prohibited by law. All paroles shall issue upon order of the board, duly adopted.

(Emphasis added.) "Nothing contained in [§ 217.690] shall be construed to *require the release* of an offender on parole nor to reduce the sentence of an offender heretofore committed." *Id*. § 217.690, subsection 10 (emphasis added).

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz*, 442 U.S. at 7 (1979). "This is because the conviction has extinguished any liberty interest in release until the sentence has been served." *Gettings v. Mo. Dep't of Corrs.*, 950 S.W.2d 7, 8 (Mo. Ct. App. 1997) (citing *Greenholtz*, 442 U.S. at 7). Nevertheless, "[s]tate statutes and regulations governing parole can create a constitutionally protected liberty interest in parole . . . if they specifically *mandate* that parole must be granted when certain criteria are met." *Id.* at 9 (emphasis added) (citations omitted). "Where the relevant statutes and regulations do not create mandatory criteria for parole but instead leave the question of parole to the discretion of the parole board, then the prisoner has no liberty or due process right to parole just because non-mandatory guidelines have been met." *Id*. (citation omitted).

The Missouri Court of Appeals has "specifically found that [§ 217.690.1] does place the parole decision in the wide discretion of the Board." *Id*. (citation omitted). It has also concluded that "[t]he regulations do not entitle a prisoner to release simply because the prisoner completes the program" and that a program graduate is "not entitle[d] . . . to release at a specific time. The standards for release are those set out in the statute, and even then release is firmly committed to the Board's discretion." *Wheat v. Mo. Bd. of Probation & Parole*, 932 S.W.2d 835, 839 (Mo. Ct. App. 1996).

Thus, even if Jackson had completed the OUTP, Missouri law never guaranteed him early release; at best, he was receiving only a *possibility* of early release under the OUTP. Moreover, he suffered no punishment, threat of punishment, or significant

penalty following his withdrawal from the OUTP, and the possibility of early release via other avenues still remains. At oral argument, when asked whether Jackson "would have still been able to seek parole" without participating in the OUTP, Jackson's counsel responded, "Correct, Your Honor," provided that Jackson was otherwise qualified. Jackson's counsel was again asked whether Jackson would "have a chance for early release" if he did not complete the OUTP, to which counsel replied, "There may be a basis, as any other inmate would have, provided that . . . the terms of his incarceration would allow for early release on parole." Jackson never alleged in his complaint that all avenues to early release are now foreclosed since his withdrawal from the OUTP.

Having to pursue another avenue for the *possibility* of early release is not a punishment or significant penalty. It is drastically different from subjecting an individual to imprisonment as a violation of probation for not attending meetings, *Warner*, 115 F.3d at 1074; *Inouye*, 504 F.3d at 713, or classifying an inmate to a higher security risk category or placing adverse notations in his prisoner record that could affect his parole eligibility, *Kerr*, 95 F.3d at 479. Thus the removal of Jackson's possibility of early release via this one avenue—the OUTP—is not "clearly coercive." *Inouye*, 504 F.3d at 713.[6]

### III. *Conclusion*

Accordingly, I would affirm the judgment of the district court.

————————————————

------

[6]Because I conclude that Jackson's complaint fails to state a First Amendment claim, I do not reach whether Jackson adequately pleaded that Crawford, Salsbury, and Burgess—government officials—violated his constitutional rights. *See* Majority Opinion, Part II.B., *supra*.