**GLENSIDE CENTER, INC., Appellant**

v.

**ABINGTON TOWNSHIP ZONING HEARING BOARD, Abington Township and Easton Road Realty Company.**

Commonwealth Court of Pennsylvania.

Argued Feb. 24, 2009.

Decided March 17, 2009.

Reargument Denied May 5, 2009.

Patrick M. McHugh, Philadelphia, for appellant.

Bruce J. Eckel, Glenside, for appellee, Abington Township Zoning Hearing Board.

Robert R. Herder, Jr., Ambler, for appellee, Abington Township.

BEFORE: PELLEGRINI, Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Glenside Center, Inc. (Glenside) appeals from an order of the Court of Common Pleas of Montgomery County (trial court) affirming the decision of the Zoning Hearing Board of Abington Township (Board) that its use of an office building for Alcoholic Anonymous meetings was not a use permitted in Abington Township (Township) and was not a violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc(a)(1).[1] Glenside also appeals the trial court's decision affirming the Board's denial of Glenside's request for a use variance.

Gary Gordon, DPM (Dr. Gordon) owns property located at 2285 Cross Road, East Building, Glenside, Pennsylvania. The property is zoned in the Special Commercial District (SC)[2] which, pursuant to the Abington Township Zoning Ordinance (Or-

---

1. 42 U.S.C. § 2000cc(a)(1) provides:
   (a) Substantial burdens
   (1) No government shall impose or implement a land use regulation in a manner that imposes a *substantial burden* on the *religious exercise* of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
   (A) is in furtherance of a compelling governmental interest; and

   (B) is the least restrictive means of furthering that compelling governmental interest.

2. The purpose of the SC district is to provide for a variety of commercial establishments and service businesses that offer specialized goods or services to markets generally greater than the immediate local neighborhood. Section 401.1 of the Ordinance.

dinance), allows for an F–1 office use in that district.[3] Glenside signed a lease with Dr. Gordon on January 14, 2007, to lease a portion of his building for the purpose of holding "group meetings" for members of Alcoholics Anonymous (AA), Narcotics Anonymous (NA) and Debtors Anonymous (DA).[4]

This matter arose when Glenside received a letter dated March 7, 2007, from Lawrence Matteo, Jr. (Matteo), the Township's Director of Planning and Code Enforcement, notifying Glenside that its use of Dr. Gordon's building pursuant to the Ordinance—F–5 Professional Services [5]—was not permitted within the SC zoning district in which the property was located.[6] Glenside appealed that determination to the Board arguing that it was using the building for office purposes because in addition to the meetings that were held at the office building, the building served as Glenside's administrative offices from which bills were paid and meetings were held concerning the governance of Glenside. In the alternative, it stated that it was seeking a use variance from the Board. It further stated that it was taking the position that the Board had to consider the matter pursuant to the RLUIPA. "While AA or its related organizations do not claim to be an established religion, the constituent groups can and have been viewed as engaging in an exercise of religion." The Act broadly defines religious exercise to include "any exercise of religion, whether or not compelled by, or central to, a system of religious beliefs." (April 1, 2007 Letter to Matteo from Patrick McHugh, Esquire, Counsel to Glenside.)

Before the Board, Mr. McHugh testified on behalf of Glenside whom he was representing. He stated that Glenside, a not-for-profit corporation, held 38 meetings a week at the office building with each meeting lasting one hour, with the exception of a handful of meetings lasting one-half hour longer. He stated that the attendance at most of the meetings was 15 to 20 people depending on which night the meeting took place. However, on Saturday nights, when a beginner's meeting was conducted, up to 60 people might attend. Mr. McHugh testified that he was made aware of opposition from neighbors who complained of parking problems, noise and loitering from members attending the meetings. As for the meetings themselves, he stated that Glenside was not a religious organization and none of the

---

3. Section 401.2.A of the Ordinance. Section 706.F of the Ordinance defines an "Office Building," in relevant part, as follows:
   Such use shall include a building, structure, or use containing single or multiple tenant spaces in which the uses *are primarily office functions* in nature. (Emphasis added.)

4. The lease specifies: "**Use.** Lessee shall use and occupy the premises for group meetings. The premises shall be used for no other purpose. Lessor represents that the premises may lawfully be used for such purpose." (Reproduced Record at 314a.)

5. The F–5 professional services use is defined in the Ordinance as follows:
   Such use shall include a building, structure, or use for an office by an architect, *counsel-*

*or*, insurance agent, lawyer, real estate broker, manufacturer's representative, and similar professional offices, excluding dental, health, medical or persona care uses, which do not include the exchange or delivery of merchandise on the premises, or storage of goods which are more than accessory to a standard office environment.

6. Prior to receiving the Township's letter, the Township and Glenside had received complaints from neighbors who lived near the office building stating that members attending the AA, NA and DA meetings were causing traffic/parking problems; noise problems; leaving garbage in the area and were loitering late into the evening hours.

meetings were led by a minister, priest, rabbi or other religious/spiritual leader. Further, the materials relating to the AA program specified that AA was not a religious organization.

Also testifying was Clair Moyer (Moyer), the President of Glenside for 17 years. He stated that Glenside did not have any employees and no fees were collected because the sole purpose of the lease was to hold group meetings. Moyer stated that Glenside was incorporated under the non-profit corporation law of 1988 for the purpose of providing meeting locations for AA and admitted that there was nothing in the incorporation papers that indicated the purpose was for any kind of religious purpose. He stated that the only requirement for AA membership was a desire to stop drinking. No one was denied entry into AA. Moyer stated that AA did not have any religious services, there was no endorsement or connection with a religious group, and there was no religious affiliation at all. The same was true for NA and

DA. However, AA did encourage its members to seek a connection with a higher power that some people called God or Jesus, but a member did not have to have faith to recover and work the steps of AA. He addressed the neighbors' concerns regarding the noise, trash and parking and how he attempted to cure those problems by meeting with leaders in the community and having a public meeting and utilizing a church's parking lot.

Thomas Deveney (Deveney), a member of AA for 53 years, testified regarding his involvement with Glenside for 45 years. He explained what a typical AA meeting was like and then read the 12 Suggested Steps of AA.[7] He testified that AA was a spiritual program and stated the difference between a spiritual program and a religion was that he belonged to a religion and practiced its precepts but AA taught him spirituality.[8] When asked if AA encouraged participants to seek contact with a higher power, whatever they might call it, he responded: "Well, they just say, this is

7. The 12 Suggested Steps of AA are as follows:

> 1. We admitted we were powerless over alcohol-that our lives have become unmanageable.
> 2. Came to believe that a Power greater than ourselves could restore us to sanity.
> 3. Made a decision to turn our will and our lives over to the care of God as we understood him.
> 4. Made a searching and fearless moral inventory of ourselves.
> 5. Admitted to God, to ourselves, and to another human being the exact nature of our wrongs.
> 6. Were entirely ready to have God remove all of these defects of character.
> 7. Humbly ask Him to remove our shortcomings.
> 8. Made a list of all persons we had harmed, and became willing to make amends to them all.
> 9. Made direct amends to such people, wherever possible, except when to do so would injure them or others.

> 10. Continued to take personal inventory and when we were wrong promptly admitted it.
> 11. Sought through prayer and meditation to improve our conscious contact with God, as we understood Him, praying only for knowledge of His will for us and the power to carry that out.
> 12. Having had a spiritual awakening as the result of these steps, we tried to carry this message to alcoholics and to practice these principles in all our affairs.

(Alcoholics Anonymous World Services, Inc., Alcoholics Anonymous, at 59–60 [3d ed.1976]).

8. He stated:

> "It teaches me not to have an intellectual blindness to the other side of the story. It teaches me to be a person not to be too grandiose or engage in my own self-importance. It teaches me how to treat my wife and children in the same way I would treat anyone, a king or anyone else." (Reproduced Record at 75a.)

what we did. If you want what we have, you better do as we did [and that was to seek a higher power]." (Reproduced Record at 76a.) Deveney stated that AA had members of various religious backgrounds including Catholics, Protestants, Jews, Muslims and even Atheists. Following his testimony were several AA members who testified that they were from a variety of religious backgrounds. One stated that he had found God at the AA meetings while another testified that the meetings were spiritual and another stated all meetings ended with a prayer.

Various neighbors from the community introduced photographs into evidence showing the adverse parking situation on the street by the office building which made driving difficult and dangerous and prevented emergency traffic from getting through. Other neighbors testified that they observed members of Glenside urinating in public, using obscene language and trash which had been left by members attending meetings.

The Board determined that Glenside's use of the office building was an "E–2 Community Center Use"[9] and not an "F–1 Office Use." It then determined that because an "E–2" use was not permitted in the SC zoning district, a use variance was required. However, because granting the requested variance would adversely affect the health, safety and welfare of the public and would be out of character with the surrounding community, and Glenside failed to meet its burden of proving an unnecessary hardship, the Board denied its request for a variance. Regarding the RLUIPA, the Board explained that the Act stated that no government could impose or implement a land use regulation in a manner that imposed a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrated that the imposition of the burden on that person was in furtherance of a compelling government interest. The Board determined that Glenside's activities were not a free exercise of religion, the regulations at issue did not impose a "substantial burden" on any of the activities proposed by Glenside, and the Ordinance was not a substantial burden on Glenside's religious exercise because the provision not permitting a community center and group meeting center in the SC zoning district did not constitute a violation of Glenside's right of free exercise of religion in violation of the RLUIPA.[10]

Glenside appealed to the trial court which affirmed the Board. The trial court addressed Glenside's use of the office building and also concluded that the meetings held at the building did not meet the criteria for an F–1 use which were "primarily office functions." The trial court pointed out that Glenside's lease specified that the purpose of the lease was to provide a place for group meetings and no other purpose and no evidence was presented as to any significant clerical or

9. The Ordinance defines "Use E–2: Community Center" as follows: An area, building, structure, or other facility used and open to residents or friends of a neighborhood community, for educational, social or recreational programs and other community uses, and owned and operated by a civic, educational, municipal, philanthropic, religious, or tax exempt entity:

    a. The use shall not be conducted as a private, gainful business.

    b. No outside recreational area shall be located nearer to any residential lot line than one hundred (100) feet.

10. The Board also found that it was not a violation of the Pennsylvania Religious Freedom Protection Act, Act of December 9, 2002, P.L. 1701, 71 P.S. §§ 2401–240771 P.S. § 2401.

business activities taking place on the premises apart. Regarding Glenside's request for a use variance, the trial court also agreed with the Board that Glenside failed to present any evidence of a hardship preventing reasonable use of the premises in conformity with the Ordinance. Additionally, the testimony from neighborhood residents regarding parking problems, noise, trash and loitering supported the Board's determination that granting a variance would have been detrimental to the public's health, welfare and safety. The trial court also found that the Board did not err in its determination that Glenside's use was actually a "community center." However, even if the Board incorrectly characterized it as such, Glenside was still not entitled to relief because its use was not an F–1 office building use.

Finally, the trial court found that there was no violation of the RLUIPA because Glenside failed to establish that its use of the office building constituted an exercise of religion. The trial court relied on a pamphlet introduced into evidence that contained the questions whether AA was a religious organization or allied with any religious organization to which both answers were "No." It also relied on testimony that no AA, NA or DA meetings were held to serve any religious belief and no religious ceremonies were held. While there was testimony that AA members were encouraged to connect with a higher power, the testimony was also that it was not a requirement. Based on all of that evidence, the trial court affirmed the Board.

Glenside then filed the present appeal raising the following issues:

- Whether the Board improperly found that Glenside was not using the 2285 Cross Road space for an F–1 Office use;

- Whether the Board's denial of its request for zoning relief violated Glenside's rights under the RLUIPA;

- Whether the Board's determination that the Glenside Center is a "Community Center" created a substantial burden on its free exercise of religion; and

- Whether the Board failed to prove a compelling governmental interest and used the least restrictive means to further that interest.

We will address these issues *in seriatim.*[11]

Glenside first contends that the Board erred in concluding that it was not utilizing the leased space at 2285 Cross Road for an F–1 office use. While Glenside admits that it holds meetings at the leased space, it also points out that it utilizes the space as an office by keeping records and supplies in the office, including its literature, as well as a telephone and numerous chairs. Glenside argues that it does not need traditional office equipment such as a computer or filing cabinets because it is a small non-profit, single-purpose business. It has performed office functions for 46 years utilizing pen and paper which has worked sufficiently. Glenside is mindful of the definition found in Section 706.F–F(1) of the Ordinance which requires that an office building be "primarily" used for office functions and believes it proved to both the Board and the trial court that it utilized the space for that reason as well as for a meeting place. We disagree.

11. In zoning appeals where the trial court has taken no additional evidence, our scope of review is limited to determining whether the Board committed an error of law or an abuse of discretion. *Zitelli v. Zoning Hearing Board of the Borough of Munhall,* 850 A.2d 769 (Pa.Cmwlth.2004). An abuse of discretion is found where the findings of the Board are not supported by substantial evidence. *Id.* Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.*

In finding that Glenside did not use the leased space "primarily" for office functions, the Board and trial court relied on Glenside's testimony that 38 meetings per week lasting one or more hours were held at the leased space. There was no testimony that anything else occurred there. Glenside's President, Moyer, testified that the activity/location was a "group meeting place" stating the following:

It's a meeting place. It's a place just for people to come, go to different types of meetings. Because there's different types. There's women's meetings, there's men's meetings, there's big Book meetings, there's speaker meetings, there's beginners' meeting, there's As [sic] God as I understand it meetings, there's a God Sunday Peace Group meeting, there's all kinds of meetings, and most of them are based just—I mean, it's just people getting together.

(Reproduced Record at 134a.) In concluding that the leased space was not primarily utilized as an office, the trial court summed it up best by stating:

"The Board's determination that appellant's use is not 'primarily office functions in nature' is amply supported by evidence of record. The record establishes that appellant's primary use of the premises is not as an office—in any **commonly understood meaning of the term**—but as a site for group meetings. . . . . Mr. Moyer testified that appellant has no staff-apart from a cleaning person—and that nowhere on the premises are there any computers, typewriters, or filing cabinets. No evidence was presented as to **any significant clerical or business activities taking place on the premises,** apart from answering the telephone and collecting mail. The evidence indicates that any 'office functions' taking place at the premises **are few, and are purely incidental to the pri-**
**mary use of the premises**—the group meetings."

(Trial court's June 25, 2008 decision at 4–6.) Glenside cannot deny that it does not use the leased space to any *significant degree* for business purposes but rather uses it to a *significant degree for meetings.* Any business it conducts, such as collecting mail and answering a phone, is incidental to its purpose of conducting AA, NA and DA meetings. While there may be chairs in the leased space, they are surely kept there for the numerous attendees of the meetings as is the literature and supplies it provides to those attending. Consequently, we find no error with the Board's determination that Glenside was not using the property as an F–1 office use.

Glenside then argues that the Board erred in classifying it as an E–2 Community Center use, also a use not permitted in the SC zoning district. The Board came up with that designation after Glenside's President testified that the activity was a group meeting place, and the trial court determined that there was no error in this designation. Although the designation does not fit perfectly because under an E–2 Community Center use the property must be owned and operated by a civic, educational, municipal, philanthropic, religious or tax exempt entity, and Glenside leases the property, Section 703.B of the Ordinance provides that:

When a proposed use does not precisely match a use code classification defined herein code enforcement officers shall determine which described use it most closely matches. If the principle use proposed is similar in most respects to a given described use, then the proposed use shall be classified according to the use code established herein.

However, even if the Board improperly classified Glenside as an E–2 Community

Center use, it still does not fall within the F–1 office use and the E–2 Community Center use classification is, at best, *de minimis* error.

■ Glenside argues next that even if it does not fall within the F–1 office use, it is a protected entity under RLUIPA because its activities are a religious exercise under 42 U.S.C. § 2000cc(a)(1).[12] Glenside argues that AA is not a religion, but its activities and programs constitute a free exercise of religion under RLUIPA. It contends that the 12–step program that AA follows is certainly based upon a belief in a higher power, and various AA members testified that they found a connection with God by attending AA meetings. Glenside directs our attention to a New York Court of Appeals case, *Griffin v. Coughlin*, 88 N.Y.2d 674, 649 N.Y.S.2d 903, 673 N.E.2d 98 (1996), which held that an AA meeting constituted an exercise of religion.

The Board, however, argues and we agree that Glenside presents no binding authority [13] for its proposition that an AA meeting is a religious exercise as that term is used in RLUIPA.[14] Glenside failed to prove that any of the meetings are admin- istered by a religious leader, i.e., a minister, priest, rabbi or other spiritual leader. Glenside does not hold any religious services or have any religious affiliations. Its Articles of Incorporation state nothing about being incorporated for a religious purpose, but only to assist people in recovering from addiction. Similarly, Glenside's printed materials state that Glenside is not a religious organization and do not require that members possess any religious belief to participate. While Glenside argues that members have found a connection with God at its meetings, clearly, the primary purpose of the group meetings, whether they be for AA, NA or DA, is to support individuals who are recovering from alcohol, drug, gambling and debtor addictions, not to advance religion. Particularly where AA and NA meetings are concerned, the primary concern of those meetings is to treat substance abuse. Moreover, Glenside and others on its behalf testified that members come from all religious walks of life whether they be Catholic, Protestant, Jewish, Muslim or non-believers in a higher power. The fact that the 12–step program is used and it contains references to "God" and a "Higher

---

12. Glenside specifies that this case does not invoke Pennsylvania's Religious Freedom Protection Act because that Act "does not contain the expanded definition of 'free exercise.'" (Glenside's brief at 14.) It also did not invoke any claims under the Pennsylvania or United States Constitutions "based on the specific statute it invoked. [Glenside has] not raised any state or federal constitution defenses related to applying RLUIPA to this matter." *Id.*

13. Glenside cites *Griffin* in support of its position. We first note that that case dealt with meetings in a prison setting modeled after AA which a prisoner was forced to attend as a precondition to his continued participation in the state prison's family reunion program. The Court of Appeals of New York held that the prison could not condition his eligibility for the family reunion program on participation in the prison's treatment program that incorporated religious aspects of the 12–step treatment program because it violated the Establishment Clause as it endorsed religion. Not only is that case distinguishable because the prisoners had nowhere else to go and the members are free to attend other meetings, but that case involves an Establishment Clause issue which is not present here.

14. RLUIPA defines "Religious exercise" as follows:

   (A) In general. The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.
   (B) Rule. The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose. 42 U.S.C. § 2000cc–5(7)(A)(B).

Power" does not mean that all members believe that they are partaking in a religious experience when they are attending an AA or NA meeting.

Because the group meetings are for the purpose of treating addictions and not for exercising religion, no matter what the religion is, the trial court did not err in determining that Glenside was not using the leased office space at 2285 Cross Road for religious purposes.[15]

Accordingly, the order of the trial court is affirmed.

**ORDER**

AND NOW, this *17th* day of *March,* 2009, the order of the Court of Common Pleas of Montgomery County, dated June 25, 2008, is affirmed.

15. Based on how we have determined this issue, we need not address Glenside's contention that the Board's determination that it was a "Community Center" was a substantial burden on its free exercise of religion and the Board failed to prove a compelling governmental interest and used the least restrictive means of furthering any compelling governmental interest.