**4154 ROOSEVELT STREET, LLC, Appellant**

v.

**ZONING HEARING BOARD OF THE TOWNSHIP OF WHITEHALL and Township of Whitehall.**

Commonwealth Court of Pennsylvania.

Argued March 10, 2014.
Decided April 7, 2014.

Mark R. Malkames, Allentown, for appellant.

Jeffrey B. Matzkin, Whitehall, for appellee Zoning Hearing Board of the Township of Whitehall.

Christopher W. Gittinger, Allentown, for appellee Township of Whitehall.

BEFORE: LEADBETTER, Judge, and LEAVITT, Judge, and McCULLOUGH, Judge.

OPINION BY Judge McCULLOUGH.

4154 Roosevelt Street, LLC (Roosevelt) appeals from the July 11, 2013 order of the Court of Common Pleas of Lehigh County (trial court), which affirmed the decision of the Zoning Hearing Board of the Township of Whitehall (Board) denying Roosevelt's application for: a special exception to change from the pre-existing nonconforming use as an industrial building to a nonconforming use as an apartment building; a special exception for off-site parking; recognition that the property is nonconforming with respect to certain distance and dimension requirements of the Township of Whitehall (Township) Zoning Ordinance (Ordinance); and numerous variances.[1] We now reverse and remand.

The underlying facts of this case are not in dispute. Roosevelt is the owner of improved property located at 4154 and 4159 Roosevelt Street and two adjacent, vacant lots on Truman Street, Whitehall, Lehigh County, Pennsylvania (Property). The Property is located within two zoning districts, the R4 Medium Density Residential Zoning District and the R5A High Density Residential without Apartments Zoning District, and is surrounded by single-family residences.[2] The Property includes a two-story structure comprised of 46,016 square feet that had been used by Majestic Sportswear (Majestic) as a clothing manufacturing facility, a nonconforming use, until 2007.[3] In 2007, VF Corporation purchased Majestic and closed the facility. Since that time, the Property has remained vacant.

Roosevelt purchased the Property in September 2009. Roosevelt initially proposed to convert the Property into an apartment building containing fifty-four studio apartments, ranging from 445 to 1,000 square feet, as well as a laundry room, gym, and courtyard. Roosevelt sought special exceptions relating to the conversion from a nonconforming industrial use to a nonconforming use as an apartment building and for the use of off-site parking.[4] Roosevelt also sought numerous

1. The variances related to parking requirements; apartment density requirements; screening requirements; use as a multi-tenant apartment building in the R4 and R5A zoning districts; driveway location requirements; rear and side yard setback requirements; density requirements; and impervious coverage requirements.

2. The Ordinance does not permit apartments in either the R4 or R5A Zoning Districts. Rather, the Ordinance permits only single-family detached dwellings, single-family attached dwellings, single-family semi-detached dwellings (twins), and dwellings consisting of not more than two dwelling units. Sections

27–74 and 27–76 of the Ordinance; Reproduced Record (R.R.) at 504a.

3. Prior to Majestic's ownership, the Property had been owned by another clothing manufacturer, Cross Country Clothing.

4. Section 27–60(D)(6) of the Ordinance addresses nonconforming uses and provides as follows:

   (6) A nonconforming use may be continued but shall not be changed to another nonconforming use except by special exception from the Zoning Hearing Board and when all of the following conditions are met to

variances relating to apartment density, parking, screening, driveway location, rear and side yard setbacks, density, and impervious coverage. The Board denied Roosevelt's application, concluding that it failed to meet the requirements for a special exception or for the requested variances, and the trial court affirmed the Board's decision. Roosevelt appealed to this Court, and in an unpublished opinion authored by now-President Judge Dan Pellegrini, this Court affirmed.[5]

On November 9, 2011, Roosevelt filed the present application seeking the same special exceptions and variances it previously sought as well as recognition that the Property is nonconforming with respect to certain distance and dimension requirements of the Ordinance.[6] However, in this application, instead of proposing fifty-four apartments, Roosevelt proposed forty-nine apartments with an average size of approximately 1,000 square feet. More specifically, Roosevelt proposed a mix of studio and one-bedroom apartments for lease to single professionals, young couples, and the elderly, with a restriction on the number of people per unit. Roosevelt proposed the

---

the satisfaction of the Zoning Hearing Board:

(a) All of the proposed use is conducted within a building.

(b) The building cannot reasonably be modified to contain a conforming use.

(c) The proposed nonconforming use is less detrimental to its neighborhood, surroundings and the general public welfare than the use it is to replace. The Zoning Hearing Board shall take into consideration all factors which might affect the public's interest including: traffic generated, nuisance characteristics such as emission of noise, odor, dust and smoke, fire hazards and hours and manner of operation.

(R.R. at 22a.)

**5.** *See 4154 Roosevelt Street, LLC v. Whitehall Township Zoning Hearing Board* (Pa.Cmwlth., No. 2719 C.D.2010, filed July 1, 2011), 2011 WL 10893884.

**6.** In addition to the requirements for nonconforming uses described above in section 27–60(D)(6), an applicant for a special exception must also meet the requirements of section 27–45(E) of the Ordinance, which states, in relevant part, that:

E. The Zoning Hearing Board and Commissioners shall approve any special exception or conditional use which meets all of the provisions of this chapter, and:

(1) The proposed use:

(a) Is in accord with the existing Comprehensive Plan and the spirit, intent and purpose of this chapter.

(b) Is in the best interests of the Township.

(c) Is suitable for the site chosen.

(d) Is designed, maintained and used so as to be in harmony with adjacent properties in the immediate vicinity.

(2) The proposed use permits the logical, efficient, safe and economic extension of public services and facilities, including but not limited to water, sewer, stormwater controls, schools, police and fire protection.

(3) The proposed use does not:

(a) Substantially increase traffic congestion on the streets.

(b) Increase the danger of fire or panic or otherwise endanger the public safety.

(c) Overcrowd the land or create an undue concentration of population.

(d) Impair an adequate supply of light and air to adjacent property.

(e) Adversely affect the comprehensive plan of the Township.

(f) Unduly burden water, sewer, school, park or other public facilities.

(g) Endanger the safety of persons or property by improper location or design of facilities for ingress or egress.

(h) Otherwise adversely affect the public health, safety or general welfare.

(i) Violate any Federal or State law, statute, rule, directive or regulation.

(j) Interfere or encroach upon any wetlands or floodplains.

(4) The proposed use is not:

(a) Inconsistent with the surrounding zones and uses.

(b) Detrimental to the appropriate use of adjacent property.

(R.R. at 22a–23a.)

use of both on-site and off-site lots (Truman Street lots), for a total of ninety-nine parking spaces.[7] The Board conducted several hearings with respect to this application.

At these hearings, Roosevelt presented the testimony of its principal, Nat Hyman, a successful retailer and real estate developer in the Allentown area. Hyman focuses his real estate development on the adaptive reuse of old commercial buildings, i.e., converting these buildings to residential uses. Hyman described the current proposal, noting that studio and one-bedroom apartments, each with two assigned parking spaces and limited to two occupants, will generate less traffic than two-bedroom or three-bedroom units. Hyman also asserted that his proposal would generate less traffic than the previous uses at the Property, which utilized the same parking lots. Hyman noted that the Township's Comprehensive Plan discourages high density residential use, except with respect to the conversion of old mill buildings into apartments.[8] Hyman estimated that the conversion would cost approximately $4 million.[9] (R.R. at 332a–54a.)

Hyman stated that the Property is obsolete in terms of any future manufacturing/distribution purposes, noting that the garment industry is nearly obsolete in the United States, with most of the production taking place in China, that the Property is not ideally located next to a major highway, and that it lacks a clear span space, and instead is filled with columns every twenty-five feet. Hyman testified that the proposed use would be conducted entirely within the building and that his proposed use would be more consistent with the surrounding residential neighborhood than the previous uses at the site. Hyman specifically denied that the Property could be used for any of the permitted purposes in an R–4 or R–5A zoning district.[10] Hyman opined that the relief he sought was the minimum relief which will afford a reasonable use of the Property. (R.R. at 358a–80a.)

On cross-examination, Hyman testified that the Property had been marketed since the time of his purchase in 2009 as manufacturing, warehouse, distribution, storage, and office space, but Roosevelt received no responses to the advertisements. Hyman conceded that, theoretically, the Property could be used as a municipal building, church, school, day-care center, or indoor recreation facility. Hyman reiterated that the proposed use would generate less traffic than the prior uses at the site because the traffic would be intermittent with the

---

7. Section 27–45(M) of the Ordinance provides that "[r]equired off-street parking shall be on the same lot, parcel or tract as the principal use, or, if permitted by special exception, not to be on the same lot, parcel or tract, then within 300 feet of the principal use and within the same zoning district...." (R.R. at 24a.)

8. The Township's Comprehensive Plan "recommends maintaining a moderate development density in most of the older areas [such as where the Property is located] rather than providing areas for new high density residential development." (R.R. at 780a.) However, the Comprehensive Plan goes on to state that "[h]igher densities should only be considered for a) housing developments that are limited to senior citizens and the physically handicapped, and b) **the conversions of older non-residential buildings (such as old mills) into apartments.**" *Id.* (emphasis added).

9. Hyman testified that he obtained an estimate of the cost of razing the building in the amount of $353,000.00.

10. The permitted uses in these zoning districts include, *inter alia,* agriculture; cemetery; church; municipal building; school; indoor or outdoor recreation facility; or day-care center. (Sections 27–74 and 27–76 of the Ordinance; R.R. at 904a.)

apartments, as opposed to the prior increased traffic that occurred at specific times because of people arriving and leaving around the same time for shift changes. Hyman also acknowledged that the Ordinance currently only permits a maximum of nineteen units at the Property. Finally, Hyman noted that he currently rents out approximately seventy-five units in various buildings throughout the Allentown area, all of which were previously old mills or other commercial buildings. (R.R. at 386a–404a.)

Roosevelt also presented the testimony of Nicole Capobianco, a principal shareholder and site manager for Majestic.[11] Capobianco testified that Majestic generally ran two shifts, one from 6:30 a.m. to 2:30 p.m. and another from 3:00 p.m. to 11:00 p.m., and sometimes ran a third, overnight shift. Capobianco stated that Majestic had fifty employees on the first shift, accounting for roughly forty vehicles, and thirty-five employees on the second shift, accounting for roughly twenty vehicles. Capobianco also noted that the manufacturing at the site resulted in daily truck traffic, between two and six deliveries each day. Capobianco testified that when VF Corporation purchased Majestic, Majestic retained the building because VF Corporation viewed the facility as antiquated. Majestic thereafter listed the Property with two real estate marketing firms, but received only one inquiry. (R.R. at 306a–17a.)

On cross-examination, Capobianco conceded that she did not have an office at the Property and was not at the site daily. Capobianco stated that she was generally familiar with Majestic's employees, their shifts, and whether they drove or rode with others to work. Additionally, Capobianco explained that in preparing for her testimony before the Board with respect to Roosevelt's original application, she sat down with Majestic's office manager, reviewed a list of employees, and noted who drove or rode with others. On re-direct examination, Capobianco testified that Majestic had fewer employees than the previous manufacturer, Cross Country Clothing. (R.R. at 318a–32a.)

Roosevelt next presented the testimony of Raymond Geiger, who has been a licensed real estate broker/appraiser for thirty-five years.[12] Geiger described the Property as unique in terms of its level of isolation and the number of residential properties surrounding the site. Geiger noted that most of these properties were single-family dwellings. Regarding the Ordinance's limit of nineteen units, Geiger explained that such units would be too large because there is no market for 2,000 to 2,500–square–foot apartments. Geiger stated that the building as it currently stands would not be in demand for industrial uses because it has low ceilings, numerous columns throughout the space, and is located some distance from road and/or rail facilities. Geiger also noted the difficulty for trucks to maneuver in the area around the building because of sharp turns, hills, traffic lights, and congestion. (R.R. at 407a–22a.)

Geiger further testified that the demand for office space was low and such space would be out of character for this neighborhood. Geiger opined that a residential use of any degree or density was less intense than any commercial/industrial use

11. Capobianco's family owned Majestic. (R.R. at 307a.)

12. Geiger also served as a member of the Lehigh Valley Planning Commission for fifteen years, and as chairman of the Comprehensive Planning Committee for ten years. (R.R. at 408a.)

and that the creation of forty-nine units was a reasonable density based on the size of this Property. Geiger also opined that forty-nine units constituted the minimal relief necessary to allow a reasonable use of the building. Geiger stated that the Township's Comprehensive Plan encourages the type of adaptive reuse that Roosevelt sought for the Property and that the permitted uses in the R4 and R5A zoning districts, while physically possible, were simply not reasonable or economically viable. Geiger noted that the estimate of $353,000.00 to raze the building on the Property was fair. (R.R. at 423a–38a.)

On cross-examination, Geiger testified that if the building were razed and the Property subdivided into residential lots, the Ordinance would only allow for six to eight residential dwellings on the Property. On re-direct examination, Geiger reiterated that limiting the number of units in the building to nineteen would be inefficient and, given the size of such units, around 2,300 square feet, people would rather buy a house than rent. (R.R. at 486a–98a.)

Finally, Roosevelt presented the testimony of Harold Newton, Jr., a registered professional engineer, land surveyor, and traffic operations engineer with certifications in erosion control and stormwater management. Newton testified that he was familiar with the history of the Property and his office prepared Roosevelt's application to the Board. Newton noted that, regardless of the type of use proposed at the Property, numerous variances would be required because of the existing nonconformities. Newton agreed that the Ordinance limits the building to nineteen units and mandates a total of ninety-eight parking spaces. Newton stated that units exceeding 2,300 square feet would not be rentable in the Lehigh Valley area, noting that larger units equate to more people

and more traffic. Newton described the proposed unit size of 1,000 square feet as average. (R.R. at 498a–517a.)

Newton testified that, when comparing the estimated traffic of the proposed use to the prior use by Majestic, the daily traffic was about the same, but on a peak hour basis, particularly in the morning, the proposed use would generate less traffic. Newton noted that the Township's traffic engineer, Pete Terry, agreed that daily traffic and peak hour traffic would be less with the proposed use. Additionally, Newton opined that the proposed use would generate the same amount of traffic as would nineteen three-bedroom units. Newton acknowledged that the building could still be used for a manufacturing use, but not the type that businesses are looking for today. Newton agreed with Geiger that the building could not be reasonably modified to accommodate any of the permitted uses in the applicable zoning districts. Newton further described the problems with surrounding intersections as operational and construction related, as opposed to traffic volume related. (R.R. at 518a–29a.)

Newton testified that the proposed use was consistent with the Township's Comprehensive Plan, would be in the best interests of the Township, and met the requirements for a special exception. Newton described the variance relief sought as dimensional, stressing that Roosevelt is not making any changes/additions to the building or expanding the lots, other than screening and landscaping required by the Ordinance. On cross-examination, Newton denied that a traffic analysis comparing Cross Country Clothing to the proposed use was prepared because the former was a much larger operation, noting that it was one of the most recent uses. Newton conceded that with respect to his analysis of

trip generation, he looked at the number of employees in the previous uses, rather than square footage. (R.R. at 534a–620a.)

Further, Newton acknowledged that Terry's letter, in addition to agreeing with his traffic analysis, did question whether it was appropriate to compare a new residential use with an old manufacturing use. However, Newton characterized this question as a legal interpretation not meant for an engineer. Newton also stated that he used the number of employees at the previous use, albeit based on estimates, rather than square footage, which was an acceptable unit of measurement for this type of analysis. Newton opined that the former method provides more accurate information. (R.R. at 639a–47a.)

Several neighboring landowners participated in the hearing before the Board by asking questions and raising objections. Primarily, the objections focused on issues relating to increased parking, increased traffic, noise, water runoff, general safety, quality of life, and the value of surrounding properties. (R.R. at 683a–94a.) One neighbor, Dennis Makovsky, specifically challenged Capobianco's estimate of the number of vehicles on the Property when Majestic operated there, stating that he physically counted only eighteen to twenty-three vehicles during first shift and seven to twelve vehicles during second shift. (R.R. at 328a.)

By decision dated October 29, 2012, the Board denied Roosevelt's application. The Board found that Geiger's testimony conflicted with the testimony of Hyman regarding the permitted uses at the Property and that Newton utilized assumptions that were "misleading" and "without foundation" in support of his testimony that the proposed use would generate less traffic than the most recent manufacturing use. (Finding of Fact No. 26.) The Board also found that the neighboring landowners established that the proposed use would substantially affect the health, safety, and welfare of the community. (Finding of Fact No. 29.)

Additionally, the Board found, *inter alia*, that Roosevelt failed to demonstrate that the building cannot reasonably be modified to contain a conforming use, (Finding of Fact No. 30); that the proposed use is less detrimental to the neighborhood surroundings and the general public welfare than the previous use, (Finding of Fact No. 31); and that the proposed use does not substantially increase traffic congestion, (Finding of Fact No. 34). Regarding the variances, the Board found that Roosevelt presented minimal testimony regarding the standards required for the granting of a variance. (Finding of Fact No. 39.) Moreover, the Board found that, since Roosevelt failed to sustain its burden under the Ordinance, it must deny Roosevelt's request for recognition that the Property was nonconforming with respect to distances and dimensions. (Finding of Fact No. 46.)

Roosevelt thereafter filed an appeal with the trial court.[13] By order dated July 11, 2013, the trial court affirmed the Board's decision. In an accompanying opinion, the trial court concluded that, with the exception of its findings relating to traffic congestion, the Board abused its discretion.[14]

13. The Township intervened before the trial court.

14. The trial court also stated that the Board's finding that Geiger's testimony conflicted with that of Hyman regarding permitted uses at the Property was incorrect as both Geiger and Hyman testified regarding the "significant obstacles facing the use of the site in question under any of the allowed uses under the applicable [Ordinance]." (Trial court op. at 23.)

The trial court held that Roosevelt met its burden of proof on nearly every listed factor for consideration. The trial court also concluded that residential development of the Property appears to be the "only tangible and feasible use of the property, but not as a high density residential development as currently proposed." (Trial court op. at 25.)

However, regarding traffic, the trial court stated that Newton relied on misleading assumptions and "seemed to take out of context one remark from the township engineer's traffic consultant (Terry) which found the traffic calculation was theoretically correct, but only if one assumes the legitimacy of the estimated traffic generation patterns created from the previous use of the site as a manufacturing facility." *Id.* The trial court held that the Board acted properly within its discretion in denying Roosevelt's special exception requests based upon the lack of any credible testimony regarding the level of traffic that would be generated by the proposed use. *Id.* Since the trial court concluded that the Board acted properly in denying the requested special exceptions, the trial court deemed the variance requests moot.[15]

On appeal to this Court,[16] Roosevelt argues that the Board erred in concluding that it did not meet the required special exception standard relating to traffic. Roosevelt also argues that the trial court erred in failing to address the Board's decision insofar as it denied the requested variances. We agree.

Roosevelt contends that it presented sufficient evidence to meet all of the Ordinance's requirements relating to a special exception. As noted above, section 27–60(D)(6)(c) of the Ordinance specifically requires an applicant to establish that the proposed nonconforming use is less detrimental to the neighborhood, surroundings, and public welfare than the previous use of the site. The Ordinance directs the Board to consider many factors that might affect the public's interest, including the traffic generated by the proposed use. Section 27–45(E)(3)(a) of the Ordinance further requires an applicant to establish that the proposed use does not substantially increase traffic congestion on the nearby streets.

In order to meet these requirements, Roosevelt presented the testimony of Capobianco, a principal shareholder and former manager for Majestic. Majestic, a clothing manufacturer which ceased operations in 2007, was the last occupant of the Property. Capobianco testified that Majestic's two shifts accounted for roughly sixty employee vehicles at the site each day. While the Board described this testimony as hearsay, (Finding of Fact No. 15), the record reveals that Capobianco's testi-

---

15. However, in a footnote, the trial court noted that "the financial hardship faced by the Applicant to effectively develop the site as one of the permitted uses or for lower density housing to justify the request for variance relief was completely foreseeable when the Applicant purchased the property." (Trial court op. at 26.) As a result, the trial court stated that "the need for variance relief cannot be justified on the grounds of the economic hardship associated with tearing down the current structure and trying to develop the property as a non-conforming use." *Id.*

16. In zoning appeals where, as here, the trial court takes no additional evidence, our scope of review is limited to determining whether the Board committed an error of law or an abuse of discretion. *Glenside Center, Inc. v. Abington Twp. Zoning Hearing Bd.,* 973 A.2d 10 (Pa.Cmwlth.2009). An abuse of discretion occurs when the findings of the Board are not supported by substantial evidence. *Id.* Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

mony was based upon her recollection of the number of employees that drove to work and a review of employee records.[17] (R.R. at 318a–19a, 328a.) Thus, we agree with Roosevelt that the Board abused its discretion in reaching this finding.

Roosevelt also presented the testimony of Newton in order to meet the Ordinance requirements relating to traffic. The Board found that Newton's testimony was based upon assumptions that were misleading and without foundation. (Finding of Fact No. 26.) However, the Board's finding in this regard was premised on Newton's reliance on Capobianco's purported hearsay testimony relating to the number of vehicles on site during Majestic's operations. Having concluded that the Board abused its discretion in characterizing Capobianco's testimony as hearsay, we likewise conclude that the Board abused its discretion in finding that Newton's testimony was based on assumptions that were misleading and without foundation.

As required by the Ordinance, Newton reviewed the previous use of the Property as a clothing manufacturer by both Majestic and Cross Country Clothing. Relying on Capobianco's testimony, Newton described the approximate number of vehicles which traversed the site during these previous uses. Newton then opined as to the number of vehicles that would occupy the site with the proposed new use. Newton ultimately opined that, when compared to Majestic, the proposed use would generate about the same amount of daily traffic, but less traffic during peak hours, particularly in the morning. Newton noted that the proposed use would not involve tractor-trailers or other delivery trucks on a regular basis. Newton further attributed any issues regarding traffic congestion to the construction of nearby intersections.

Terry, the Township's traffic engineer, agreed with Newton that the average daily traffic and peak hour traffic would be less with the proposed use than the prior use. Terry did raise concerns regarding the comparison to the prior use which had been abandoned for several years, and the trial court focused on these concerns in concluding that Roosevelt failed to meet the Ordinance requirements relating to traffic. However, section 27–60(D)(6)(c) of the Ordinance requires a special exception applicant to compare the amount of traffic that would be generated by the proposed use to the prior use.

Because Newton's testimony constitutes substantial evidence in support of a finding that the proposed nonconforming use is less detrimental to the neighborhood, surroundings, and public welfare than the previous use of the site and does not sub-

---

17. Pa.R.E. 803(6) includes an exception to the rule against hearsay for records of a regularly conducted activity, otherwise known as the business records exception, and describes the exception as follows:

(6) Records of a Regularly Conducted Activity. A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if,
(A) the record was made at or near the time by-or from information transmitted by-someone with knowledge;
(B) the record was kept in the course of a regularly conducted activity of a 'business', which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
(C) making the record was a regular practice of that activity;
(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
(E) neither the source of information nor other circumstances indicate a lack of trustworthiness.

stantially increase traffic congestion on the nearby streets, we conclude that the Board abused its discretion in finding that Roosevelt did not satisfy the Ordinance's requirements relating to traffic.

Roosevelt also argues that the trial court erred in failing to address its request for variance relief. As noted above, the trial court declared any issues relating to Roosevelt's requested variances moot given its affirmance of the Board's decision denying special exception relief. However, given our disposition above, a remand to the trial court is necessary for consideration of the Board's decision denying the variances.

Accordingly, the order of the trial court is reversed. The matter is remanded to the trial court for further consideration of the Board's decision denying Roosevelt's requested variances.

### ORDER

AND NOW, this 7th day of April, 2014, the order of the Court of Common Pleas of Lehigh County (trial court), dated July 11, 2013, is hereby reversed. The matter is remanded to the trial court to address the variance issues.

Jurisdiction relinquished.